Arthur W. SILVESTER, Sr., the Fronton, Inc., a Florida corporation, and Tourism and Development Corporation, a Rhode Island corporation, Plaintiffs,

v.

AMERICAN BROADCASTING COMPANIES, INC., a New York corporation, Geraldo Rivera, Hugh Downs, and Bernard I. Cohen, Defendants.

No. 82–8040–Civ–Paine.

United States District Court, S.D. Florida.

Dec. 30, 1986.

Bernard Hellring and Stephen L. Dreyfuss, Hellring Lindeman Goldstein Siegel & Greenberg, Newark, N.J., for plaintiffs.

Donald M. Middlebrooks and Thomas R. Julin, Steel Hector & Davis, Miami, Fla., and Michael J. Calvay, Coudert Brothers, New York City, of counsel, for defendants.

## ORDER GRANTING FINAL SUMMARY JUDGMENT

PAINE, District Judge.

This cause comes before the court on defendants' motion for final summary judg-

ment (DE 118). Also at issue are defendants' motion for partial summary judgment on the issue of punitive damages (DE 123) and various motions to compel by both parties (DE 107, 108, 109, 121, 126). The court has heard oral argument, reviewed the case file, and studied the voluminous memoranda, affidavits, depositions, and videotapes submitted by the parties as well as the relevant authorities. Now being fully advised, the court renders the following memorandum and order.

## I.

### BACKGROUND

This libel action arises out of a broadcast of the television program "20/20." On June 21, 1979, defendant American Broadcasting Companies, Inc. (ABC) published a 20/20 segment reporting on the American jai alai industry.[1] Of the individual defendants, Geraldo Rivera was the reporter of the segment, Hugh Downs the anchorman, and Bernard Cohen the producer. The segment was written by Rivera and Cohen. Subject matter jurisdiction is proper based on diversity of citizenship, 28 U.S.C. § 1332 (1982).

The 20/20 broadcast concerned events in the jai alai industry in general and plaintiffs in particular. Jai alai is a game similar to handball which is popular in Latin America and some parts of the United States. At the time of the 20/20 broadcast, Florida, Rhode Island, Connecticut, and Nevada had legalized gambling on jai alai games. Plaintiff Arthur Silvester, Sr. was president and majority shareholder of plaintiff corporations The Fronton, Inc. (The Fronton) and Tourism and Development Corporation (T & D). The Fronton was the sole owner of the arenas or frontons in West Palm Beach, Florida, and Newport, Rhode Island.

Two related series of events formed the basis of the 20/20 broadcast. The first, what may be termed the betting scandal, arose during the two years preceding the publication. The Connecticut fronton,

---

**1.** A copy of the script is attached to this order as an appendix.

which was *not* owned by Silvester, became the object of accusations of corruption concerning the presence of systems betting. It was alleged that organized professional gamblers, including a group called the Miami Syndicate, were betting large sums of money on games, and that players and management were in cahoots with them. Frontons in other states began to be swept up in the tide of investigations by law enforcement authorities and the press. An incident involving the burial of records at the West Palm Beach fronton was reported in the 20/20 broadcast. It is undisputed that plaintiffs or their employees had certain records buried at the site of the West Palm Beach fronton sometime after fire partially destroyed the fronton on December 26, 1978. Plaintiffs maintain that state authorities had given them permission to dispose of the records, although the 20/20 broadcast speculated that the records were buried because they would have shown involvement of fronton management in game-fixing. There is no evidence that the records which were uncovered by police revealed any improprieties.

Approximately four months before the fire, The Fronton had insured the building for $8 million. Theretofore, the maximum fire coverage had been approximately $4 million. After the fire, Silvester told reporters that if the fronton had been totally destroyed the damage would be approximately $8 million although he did not yet know the extent of the actual damage. In April 1979, The Fronton received approximately $6.5 million in settlement of the insurance claim.

In a six-count complaint, plaintiffs allege that they have been libeled, slandered, and otherwise harmed by the 20/20 broadcast. Count I alleges that defendants defamed Silvester by implying that he had committed crimes relating to the fire. Count II alleges that plaintiffs were defamed when defendants implied that plaintiffs had participated in crimes involving illegal betting and fixing of jai alai games and destruction of evidence regarding such alleged conduct. In Count III, plaintiffs object to defendants' republication of the statements of Harvey Ziskis, a disaffected systems bettor who made blanket allegations of corruption in the jai alai industry. Plaintiffs contend that Ziskis' statements falsely imply that plaintiffs were involved with illegal betting practices. Counts IV through VI allege the torts of intentional infliction of severe emotional and mental distress, interference with advantageous business relationships, and interference with prospective economic advantage, respectively.

Defendants assert they are entitled to final summary judgment because (1) the 20/20 broadcast was not susceptible of a libelous interpretation; (2) plaintiffs are public figures who are prohibited from prevailing in a defamation case without clear and convincing proof of actual malice, which has not been demonstrated; and (3) the broadcast is privileged under Florida common law as an accurate report of information provided by law enforcement officials regarding an investigation of possibly illegal activities, and no evidence of defendants' ill will has been proferred to defeat the privilege. Defendants maintain that the tort counts are restatements of the libel counts and therefore do not allege additional facts warranting recognition as independent claims.

## II.

### WHETHER THE BROADCAST IS CAPABLE OF A DEFAMATORY MEANING

A party seeking summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact. *American Viking Contractors, Inc. v. Scribner Equipment Co.*, 745 F.2d 1365, 1369, (11th Cir.1984). Once the moving party has sufficiently supported the motion, the party opposing summary judgment must come forward with significant probative evidence demonstrating the existence of a triable issue of fact. *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 114 (5th Cir.1978). The question for the court in a motion for summary judgment is "not whether there is literally no evidence, but whether there is any upon which a jury

could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872) (emphasis in original)).

Under Florida law, the statement at issue in a libel suit must be reasonably capable of a defamatory interpretation. This determination is to be made by the court in the first instance, prior to the jury's evaluation of whether the statement was in fact understood as defamatory. Additionally, plaintiffs must show that the statement was a false statement of fact rather than opinion, which is protected by the First Amendment. This too is a question of law. If the statements are incapable of being interpreted as defamatory statements of fact, defendants are entitled to summary judgment. *Keller v. Miami Herald Publishing Co.,* 778 F.2d 711, 714–15 (11th Cir.1985). Plaintiffs essentially contend that the 20/20 broadcast contained a mixture of truths, half-truths, and untruths which were put together in a way as to be defamatory. Defendants argue that the broadcast was either true, substantially true, or a statement of opinion, and therefore was not defamatory.

When the publication is a television broadcast, the script must be evaluated in its totality, considering all the words used and not merely a particular phrase or sentence. The words and pictures must be taken together, because each constitutes an important element of the publication. The program "should be considered in its natural sense without a forced or strained construction." *Byrd v. Hustler Magazine, Inc.,* 433 So.2d 593, 595 (Fla.Dist.Ct.App. 1983). Words which imply a libelous meaning, rather than directly stating it, may be libelous on their face. *Boyles v. Mid-Florida Television Corp.,* 431 So.2d 627, 635 (Fla.Dist.Ct.App.1983), *aff'd,* 467 So.2d 282 (Fla.1985). If the statement is true, however, no reasonable person could interpret it as defamatory. *Hallmark Builders,*

*Inc. v. Gaylord Broadcasting Co.,* 733 F.2d 1461, 1464 (11th Cir.1984).

### A. *The Fire*

■ Applying these standards, we take in turn each libel count of the complaint. Count I alleges that defendants defamed Silvester by implying that plaintiffs have committed or participated in the crimes of arson, burning to defraud the insurer, theft by fraud, false and fraudulent insurance claims, and conspiracy crimes concerning the fire.

The first alleged instance of libel in this regard concerned the betting records. Rivera stated that, "at first, the fire was regarded as a serious setback by the investigators" because "betting records that could have shown a link between fronton employees and the Miami syndicate were apparently destroyed in the blaze." In support of the statement's truth, defendants proffer the affidavit of Leigh Somers, who then was chief investigator of the Florida Division of Parimutuel Wagering. Somers testifies that he believes the destroyed records "could have been extremely helpful" to his office's "investigation of corruption within the Florida jai alai industry" which began in December 1978, before the fire, and that he related those facts and his beliefs to Cohen and associate producer Susan Steiger before the broadcast. Appendix to defendant's statement of undisputed material facts, vol. I., ex. 5 [hereinafter cited as "App."]. Plaintiffs proffer the deposition testimony of Sergeant John Sprague of the Magnolia Park Police Department that he never told ABC that the fire was a setback and that, to his knowledge, there was no parimutuel investigation at the time of the fire. Sprague Deposition, March 14, 1984, at 102–03 (DE 150–B). Because these statements by a local police officer do not rebut Somers' testimony, defendants have shown the truth of this statement.

Plaintiffs next object to the reference to the uncovered records as "a mountain of evidence someone had tried to bury." Plaintiffs do not dispute that they or their employees buried the records; the bone of

contention is the characterization. There is no evidence in the record that the uncovered documents revealed anything. Taken out of context, this statement might be characterized as rhetorical hyperbole. *See National Association of Letter Carriers v. Austin,* 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974). We must examine the following statements, however, to ascertain the entire picture.

Rivera then stated that, "fortunately for the owner, Arthur Silvester," the reconstruction would cost nothing, because the building was "heavily insured" in the amount of $8 million. ABC then used a film clip taken after the fire in which Silvester estimated the damage at $8 million if the whole building had to be torn down. The unrebutted evidence shows that reconstruction in fact cost much more than $8 million. Plaintiffs therefore have shown the falsity of the statement that reconstruction costs were covered entirely by insurance proceeds.

In the next sequence, Rivera lists four "coincidences": (1) the insurance coverage "just happened to be exactly equal" to Silvester's estimate of the damage; (2) Silvester "just happened" to increase his coverage from $4 million to $8 million several months before the fire; (3) the insurance agent who sold the policy to Silvester is the brother of the manager of the West Palm Beach fronton; and (4) despite the sheriff's finding of arson, the insurance company "paid up on the policy in full." Plaintiff concedes that the insurance was doubled several months before the fire but asserts that the insurance company paid only $6.5 million on the $8 million policy and moreover that the broadcast implied plaintiffs had committed arson-related crimes.

We agree. The portion of the 20/20 broadcast which concerns the fire contains a series of statements which are truths, half-truths, and falsities. Considered together, a viewer might well understand these statements to mean that plaintiffs

had participated in various crimes such as arson and burning to defraud. The deliberate ambiguity of the word "coincidence" is telling: an obvious implication is that these were *not* coincidences. *See Herbert v. Lando,* 781 F.2d 298, 307 & n. 4 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). The title of the broadcast, shown on the screen when Downs announced the segment, was "Jai Alai: License to Steal." Downs stated that Rivera "has finished that investigation, a burgeoning jai alai scandal that is just breaking across the country." Rivera "cautioned" that, "although serious allegations will also be made concerning owner involvement, law enforcement authorities do not feel there is, as yet, sufficient evidence to bring criminal charges against anyone in jai alai management." This warning does not mitigate the implication that plaintiffs were guilty of certain crimes related to the fire. Under Florida law, an oral communication is actionable as libel per se if it imputes to another a criminal offense amounting to a felony. *Atkinson v. Equitable Life Assurance Society,* 519 F.2d 1112, 1118 (5th Cir.1975).[2] Because statements in the 20/20 broadcast relating to the fire can be understood to mean that plaintiffs had participated in various felonies, they are susceptible of a libelous interpretation.

### B. *Illegal Betting and Game-Fixing*

■ Count II of the complaint alleges that plaintiffs were defamed when defendants implied that plaintiffs had participated in crimes involving illegal betting and game-fixing and destruction of evidence regarding this alleged conduct. This count states specifically that defendants repeatedly referred to a betting scandal, game-fixing, and the Miami Syndicate of systems bettors, and that Rivera referred to a jai alai player who had turned state's witness while men in handcuffs and in police custody were shown on the screen. Immediately thereafter Rivera referred to

---

**2.** Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of*

*Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

the fire in West Palm Beach and the buried records "that could have shown a link between fronton employees and the Miami Syndicate [that] were apparently destroyed in the blaze." Rivera then used the phrase "a mountain of evidence someone had tried to bury." At the close of the broadcast Rivera stated that ABC had learned that Florida officials were planning to initiate proceedings involving Silvester and that "he [Silvester] incidentally also refused to speak with us." Rivera also reported that the Florida parimutuel division had issued a show cause order against the West Palm Beach fronton demanding to know why its license should not be revoked. He commented that this was "the first time any definitive action has been taken by any state against anyone in jai alai management" and added, "it's beginning already."

Plaintiffs claim that Silvester never refused to speak with anyone identified with ABC and that he committed no crime or improper or illegal conduct. Defendants maintain that they never said plaintiffs in fact committed these crimes and, moreover, Rivera did caution that "law enforcement authorities do not feel there is, as yet, sufficient evidence to bring *criminal* charges against anyone in jai alai management." An obvious implication, however, is that such charges could or should be brought. This interpretation is supported by Rivera's comment that "it's beginning already." The portion of the broadcast concerning the scandal is therefore susceptible of a defamatory meaning.

### C. Statements of Harvey Ziskis

In its third libel and slander count, the complaint alleges that defendants' republication of the statements of Harvey Ziskis falsely implied that plaintiffs were involved with illegal betting practices.

 Ziskis' claim that "jai alai is a totally corrupt industry" is a statement of opinion which is too general to support an action for libel. See *Ollman v. Evans*, 750 F.2d 970, 978–82 (D.C.Cir.1984) (en banc). Ziskis also stated that "there is a conspiracy existing among the fronton management, fronton employees, the systems bet-

tors and organized crime." Although this too appears to be opinion, taken in context, it is an accusation of criminal conduct sufficiently "laden with factual content" to be subject to a defamatory meaning. See *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 63 (2d Cir.1980); *cf. Church of Scientology v. Cazares*, 638 F.2d 1272, 1286–89 (5th Cir.1981). The broadcast included hidden camera shots of alleged systems bettors receiving preferential treatment from fronton employees. One individual identified by Ziskis as a systems bettor was photographed in the Newport fronton, creating the link between plaintiffs and the Miami Syndicate. Plaintiffs claim that this man actually was not a systems bettor and in fact sued ABC for libel and that an out-of-court settlement was reached. Thus, the court concludes that Ziskis' identification of a man at the Newport fronton as a systems bettor and his allegation of a conspiracy are susceptible of a defamatory meaning.

### III.

### PUBLIC OR PRIVATE FIGURES

We next address defendant's contention that plaintiffs are limited public figures within the meaning of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. Because in defamation cases such persons bear a heavier burden than private individuals, this question is critical to our inquiry at the summary judgment stage. See *Anderson*, 106 S.Ct. at 2512–15. The determination is one for the court rather than the jury. *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1247 & n. 13 (5th Cir. 1980). If no genuine issue of material fact exists, viewing the evidence in the light most favorable to the plaintiffs, we may determine plaintiffs' status on a motion for summary judgment rather than wait until the close of the evidence. See, e.g., *Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 379 (1981).

Under *New York Times*, a public official cannot recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is, with knowledge of its falsity or with reckless disregard of whether it was false. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. This rule was later expanded to include all public figures. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Some individuals obtain such pervasive fame or notoriety that they become all-purpose public figures. "More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974).

The Supreme Court has advanced two principal reasons to apply the *New York Times* rule to public figures. First, because they "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy," such individuals are less vulnerable to injury from defamatory statements. *Id.* at 344, 94 S.Ct. at 3009. More important, public figures "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," and thus have invited "attention and comment." *Id.* at 345, 94 S.Ct. at 3009.

Applying these standards, the court finds that there is no genuine dispute as to any fact material to the question of plaintiffs' status. *See* Fed.R.Civ.P. 56(c). Rather, the parties contest the legal significance of these facts. Defendants have submitted over 200 pages of newspaper articles concerning plaintiffs, the jai alai industry, and the various investigations and alleged improprieties which beset the industry in the twenty-odd months before the 20/20 broadcast. Plaintiffs admit that these articles appeared with the qualification that they do not necessarily concede the truth of the articles' contents, but plaintiffs do not specifically object to any of them.

■ To determine plaintiffs' status, the court must first identify a public controversy and second inquire into the nature and extent of plaintiffs' participation in that controversy. *Della-Donna v. Gore Newspapers Co.*, 489 So.2d 72, 76 (Fla.Dist.Ct. App.1986). A general concern or interest does not constitute a public controversy. The court must ask

> whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy.

*Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.) (footnotes omitted), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The court is convinced that the series of events concerning the jai alai industry which preexisted defendants' publication constituted a public controversy. Accordingly, the court must determine whether plaintiffs' participation in that controversy made them limited public figures.

As an initial matter, the court notes that plaintiffs entered the professional sport business knowing that it garners substantial media attention. While Silvester may not be the George Steinbrenner of jai alai, neither has he chosen to remain on the fringes of the limelight. In 1972 Silvester was quoted extolling his renovations of the West Palm Beach fronton and predicting a bright future for the industry. The following year he was pictured at the fronton with King Hussein of Jordan and Palm Beach socialite James Kimberly. When Silvester bought out T & D, the headline read, "Jai Alai Corp. votes to sell to Florida millionaire." *Id.* at 3–5. A 1974 column headlined "Silvester to Rescue" discussed his purchase of T & D and reported his desire to acquire a second Florida fronton:

They're picturing Arthur W. Silvester Sr. as an angel in Newport, R.I., a wealthy community once comparable to Palm Beach, but now hit hard by economic and sociological changes.

Indeed, a newspaper cartoonist in that area last week offered Silvester with a money-filled briefcase in one hand as he flew across the horizon of the nation's smallest state, his wings glowing in the sunlight.

Silvester only wishes his attempts to expand the jai-alai industry could be met with the same enthusiasm from the Florida Board of Business Regulation.

"Look at the record," he says, not unlike a politician running to the polls next month. "We've beaten those other people on every count in the operation of jai-alai in Florida."

. . . .

"They should give me a second fronton," Silvester says, "And I'm going to fight hard to get it. We've got a better location and I just feel we're better qualified to operate."

Silvester says he has 83 acres in a commercial area on State Road 60 west of Lake Wales, compared to 50 acres for World Jai-Alai in a residential area just north of the Polk County city.

He also cites his record of bailing out both the Daytona Beach and West Palm Beach frontons from economic disasters of the past as well as his intention to do the same at Newport.

Just last Friday, Silvester completed negotiations to buy from 81 to 85 per cent of the stock in Tourism and Development Corp., the license holder for jai alai in Rhode Island.

He'll pay back the original investors in T & D some $2.5 million, including interest, and spend another $5 million in construction in time to operate during the summer season of 1976. Construction may start within two weeks.

And he's promised to employ 300–400 Newport people, a significant contribution to the economy of the area after the severe curtailment of operations at the Newport Naval Base.

. . . .

Had not Silvester come along, and had not his bid to operate jai-alai been approved by the Rhode Island State Racing and Athletic Commission, these investors could have been wiped out.

Hence, in Newport, he's an angel, even if it's not recognized as such in Tallahassee, where a decision on Lake Wales expected to be made last summer was delayed a year.

Why does Silvester seemed determined to expand his highly successful operation of the past 20 years at West Palm Beach? Why is he taking on the regulatory agencies of two states at the tune of several million dollars?

"I saw it coming four or five years ago," he says. "You have these people working for you four or five months, but what about the rest of the year?"

*Id.* at 16 (boldface in original). When the West Palm Beach Fronton set attendance records in 1977, the press reported Silvester's "proud" announcement. *See id.* at 32. Silvester promoted the opening on the following season, lauding a star player and announcing the number of players the club had signed, and Silvester's photograph accompanied the article. *See id.* at 44. At the close of that season he reported it to have been a "fantastic" one. *Id.* at 62. Thus, the court finds unpersuasive plaintiffs' contention that they are engaged in "a business, like any other." App., vol. I, ex. 2, at 3.

The actual public controversy began sometime in 1977, when allegations of corruption in the Connecticut jai alai industry prompted questions about the Rhode Island fronton. Silvester reportedly told a Rhode Island police commission that, rather than discouraging the systems bettors,

he would prefer to set up a special window for the big bettors.

"I personally think that if a systems bettor came in to spend four or five grand, I think I'd kiss him," he said.

*Id.* at 81. This quote was reprinted in several newspapers.

When fire partially destroyed the West Palm Beach fronton, Silvester again made provocative statements which were widely quoted. A four-column newspaper headline proclaimed, "Fronton Owner: Damage at $8 Million." The article read in part:

MANGONIA PARK—For perhaps the hundredth time, owner Arthur Silvester Sr. circled the smoldering carcass of what was the $12 million Palm Beach jai-alai fronton a few hours earlier.

He was trying to find anything worth salvaging from the six-hour blaze which destroyed the auditorium, playing court, kitchen and part of the lobby of the fronton.

. . . .

"I just thank God no one was hurt. It's only money. You can always make money," Silvester said hours after watching the fronton he built 24 years ago burn and collapse.

. . . .

*"I think somebody put a match to it,"* Silvester said, at a loss to figure how the blaze could have enveloped the auditorium so quickly. *"I swear, honest to Christ, somebody burned this place down."*

The fronton, experiencing its best season financially, was to close Jan. 15. Silvester guessed the fronton would have handled $8 million during the final 27 performances.

"It was the best jai-alai building in the country. There was no other like it. If it had had steel arches, instead of laminated plywood, it would have collapsed two hours earlier," he said.

. . . .

"It's a hell of a Christmas present," he said as he paced back and forth in the parking lot. He salvaged some office furniture and a wheelchair before firemen chased him away.

. . . .

Finally after six hours, the blaze was nearly extinguished. "When we built it,

it was the highest building of its type," Silvester said. "Now it's the shortest."

"We were doing so well. We were up $2 million over last year and it looked like we were going to be up $5 million," said the 65–year-old owner.

He pledged to rebuild the fronton in time for next fall's season. "I built this fronton 24 years ago in 93 days. I built the Newport fronton in nine months. If I have to put a helmet on myself, we'll get it rebuilt," said Silvester, who was a building contractor before he was a fronton owner.

*Id.* at 103–05 (emphasis added). The article featured a picture of Silvester, apparently taken at the fire scene. The picture was approximately four by five inches. The following quote from the article was beside the picture:

*"I think somebody put a match to it. I swear, honest to Christ, somebody burned this place down."*—Arthur Silvester

*Id.* at 104 (emphasis in original). A picture of the fire was accompanied by the following caption, again quoting from the article:

"I just thank God no one was hurt. It's only money. You can always make money ... I built this fronton 24 years ago in 93 days. I built the one in Newport in nine months. If I have to put a helmet on myself, we'll get this rebuilt." —Fronton Owner Arthur Silvester Sr.

*Id.* at 105. In other articles following the fire, Silvester was quoted lamenting the damage and outlining his already beginning efforts to rebuild the fronton. One such article stated in the third paragraph, " 'We're definitely going to rebuild,' said fronton owner Arthur Silvester Sr., surveying the heavily damaged structure. 'It will be open for the next season.' " *Id.* at 110. In another article, entitled "Silvester survives longest day," the following quote was set in large type over the headline:

"I'm waiting to get inside so we can see what damage was done, so we can start planning to rebuild. Yes, definitely, we will have jai-alai here next year."—Arthur Silvester Sr.

*Id.* at 113. Silvester's allegation that he believes someone "put a match" to the fronton was repeated in other articles. The press reported that Silvester was on hand for ticket refunds and was planning the building's reconstruction.

Silvester publicly offered a $25,000 reward for information leading to the conviction of the arsonist. That story merited a six-column headline reading "Fronton owner offers $25,000 reward in fire." Silvester was again widely quoted, with the following excerpt set off in large, boldface type:

'I thought I could retire, but now I'm going back to work,' fronton owner Arthur Silvester Sr. said. 'I'm dying to find out who did this (the fire) and I'm willing to pay $25,000 for the information.' Silvester said damage to the fronton was 'worse than I expected.'

*Id.* at 144–45 (boldface in original).

In May 1979, stories began to surface about the doubling of the insurance on the fronton several months before the fire. While the newspapers reported that Silvester now declined to talk to the press, the stories cited statements he apparently had made earlier. *See id.* at 176. In a June 6 article, he talked about the rebuilding of the fronton in what the reporter characterized as optimistic tones. *See id.* at 181. When Silvester's frontons began to be drawn into the spreading betting scandals, the stories reported that Silvester declined to be interviewed.

■ Viewing this evidence in the light most favorable to the plaintiffs and giving them the benefit of all inferences, *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), the court concludes that plaintiffs are limited public figures. Plaintiffs chose to engage in professional sports knowing that media coverage was inevitable. Once involved, they promoted their business ventures in the hearty spirit of capitalism. In *Waldbaum,* 627 F.2d at 1300, the court held the plaintiff had thrust himself to the forefront of controversies sufficient to become a limited public figure where he was president of the second-largest cooperative in the county and further was a mover and shaper of many of the cooperative's controversial actions in an attempt to influence the policies of firms in the supermarket industry and merchandising generally. Similarly, the evidence depicts Silvester as aggressively pursuing his business interests in a high-profile industry. When he opened the Newport fronton, he reportedly stated he intended both to repay his original investers and "to employ 300–400 Newport people." The article stated that this would be "a significant contribution to the economy of the area." App., vol. I, ex. 2, at 16. Thus, Silvester's promotion of jai alai shows that his activities affected a segment of the general public in an appreciable way. *See id.* at 1296.

■ The fire drew further press attention. Plaintiffs contend that, if Silvester was at the forefront of these controversies, it was due to his status as a victim rather than to his voluntary actions. Plaintiffs urge that Silvester is like the wealthy socialite in *Time, Inc. v. Firestone,* 424 U.S. 448, 452–55, 96 S.Ct. 958, 964–66, 47 L.Ed.2d 154 (1976), who went to court only because it was necessary to obtain a divorce. We are not persuaded. The evidence shows that Silvester made provocative allegations of arson following the fire which he should have anticipated would be widely quoted. He subsequently made headlines by offering a $25,000 reward for information leading to a conviction. The evidence also shows that plaintiffs had the "regular and continuing access to the media that is one of the accouterments of having become a public figure." *Hutchinson v. Proxmire,* 443 U.S. 111, 136, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979).

The court therefore concludes that plaintiffs, unlike the nephew of Russian spies in *Wolston v. Reader's Digest Association, Inc.,* 443 U.S. 157, 166, 99 S.Ct. 2701, 2706, 61 L.Ed.2d 450 (1979), were not "dragged unwillingly into the controversy." Rather, they voluntarily injected themselves into the controversies surrounding their own jai alai businesses and thereby became public figures for this limited range of issues.

*See Gertz,* 418 U.S. at 351, 94 S.Ct. at 3012; *see also Street v. National Broadcasting Co.,* 645 F.2d 1227, 1233–35 (6th Cir.) (rape victim was public figure for purposes of Scottsboro Nine case where she gave press interviews and aggressively promoted her version of the case outside of actual courtroom testimony), *cert. granted,* 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83 *cert. dismissed,* 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981); *Fitzgerald v. Penthouse International, Ltd.,* 525 F.Supp. 585 (D.Md.1981) (plaintiff, who had discussed military application of dolphin technology on "60 Minutes," was limited public figure on that issue at time of publication of allegedly defamatory article), *aff'd in part and rev'd in part,* 691 F.2d 666 (4th Cir.1982), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983); *cf. Hutchinson,* 443 U.S. at 134–36, 99 S.Ct. at 2687–89 (research director and professor who had received federal funding for animal studies not public figure when named recipient of "Golden Fleece Award" for wasteful government spending). This analysis and conclusion applies not only to Silvester but also to The Fronton and T & D, the corporations substantially owned by Silvester which operated the Newport and West Palm Beach frontons. *See Trans World Accounts, Inc. v. Associated Press,* 425 F.Supp. 814, 819 (N.D.Cal.1977) (for purposes of applying First Amendment to defamation claims, corporations can be public figures).

## IV.

### PROOF OF ACTUAL MALICE

■ Having determined that plaintiffs are limited public figures, the court must next examine the evidence that the 20/20 broadcast was published with "actual malice"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26. Knowledge of falsity is self-explanatory. The Supreme Court has defined reckless disregard for the truth in subjective rather than objective terms:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *see also Boyles,* 467 So.2d 282. A libel plaintiff must show actual malice with "convincing clarity." *New York Times,* 376 U.S. at 285–86, 84 S.Ct. at 728–29.

The Court in *Anderson v. Liberty Lobby* has recently clarified our task at the summary judgment stage when the actual malice standard applies:

> [W]here the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Anderson,* 106 S.Ct. at 2514 (footnote omitted). Thus, the actual malice standard is relevant to our determination of whether plaintiffs have presented affirmative evidence in order to defeat a properly supported motion for summary judgment. *See id.;* Fed.R.Civ.P. 56(c).

As grounds for their motion, defendants contend that there is no evidence that any of them "in fact entertained serious doubts as to the truth" of the broadcast. *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325.

Absent a defendant's admission that he knew the material was false or that he doubted its truth, a public figure must rely on circumstantial evidence to prove his case. *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir.1983). Defendants have proffered evidence that the jai alai segment was thoroughly researched through interviews with experts, including various law enforcement authorities who were investigating jai alai. Additionally, other news media who were investigating jai alai came up with much of the same allegations and support, which serves to corroborate defendants' findings. If the broadcast can be interpreted as accusing plaintiffs of arson and involvement in illegal gambling activities, there is no evidence that defendants doubted the truth of these charges or any other part of the 20/20 broadcast. *Cf. Rebozo*, 637 F.2d at 382 (resolution of obvious ambiguity in favor of most damaging alternative creates jury question on malice). Considering this evidence, the court concludes that defendants have sufficiently supported their motion for summary judgment, and the burden must shift to plaintiffs to produce significant probative evidence demonstrating the existence of a triable issue of fact.[3]

■ Plaintiffs rely on several pieces of evidence as probative of malice. First, plaintiffs argue that defendants' republication of Ziskis' statements and reliance upon him as a source demonstrates actual malice. There is evidence that defendants were warned by law enforcement officials of Ziskis' unreliability. The most serious allegation is contained in the affidavit of Richard Hurley, a Connecticut State Police lieutenant. Hurley states that he warned Cohen on several occasions that Ziskis frequently made "outlandish, exaggerated and inaccurate claims," and that Ziskis had been an informant for the Connecticut State Police "but turned out to be worse than the people he was informing upon." Cohen asked Hurley if there was anything good he could say about Ziskis, and Hurley responded that he could say that Ziskis had given him good information shortly after they met, which was before Hurley learned of Ziskis' unreliability. ABC then recorded and included in the 20/20 broadcast Hurley's staged statement. *See* DE 142.

Although defendants might have distorted the truth somewhat by choosing to accredit Ziskis, the court does not believe this demonstrates malice in the circumstances of this case. Rivera stated in the broadcast that Ziskis, rebuffed in his efforts to become a systems bettor, "decided to apply the modern philosophy of not getting angry but getting even." Ziskis' attorney appeared in the broadcast stating, "he's a professional gambler. He's no innocent. I didn't represent an innocent. He wanted in." Thus, the viewers of the broadcast were not led to believe that Ziskis' credibility was unimpeachable. Defendants' efforts to temper the impact of Ziskis' statements by presenting him as a man with an ax to grind, as well as the corroboration they obtained, distinguish this case from *Hunt v. Liberty Lobby*, 720 F.2d 631, where the editor and publisher had reason to and in fact did question the author's neutrality. Nonetheless, the *Hunt* defendants obtained little independent verification and relied almost exclusively on the reporter's reputation in deciding to publish a controversial article linking E. Howard Hunt to the assassination of President Kennedy. In this case, defendants' attempts to bolster Ziskis' credibility might raise triable issues of malice if a defendant knowingly

---

3. Plaintiffs contend that their efforts to marshal evidence about defendants' state of mind have been frustrated by defendants' refusal to permit any witness to testify concerning the activities of ABC executive and attorney Sam Antar and defendants' consultations with him both before and after the broadcast. Plaintiffs further assert that defendants' misconduct in blocking this discovery is sufficient to deny summary judgment. The court disagrees. Even if Antar's activities in preparing the broadcast are not within the scope of attorney-client privilege, the court believes that the other evidence about the preparation of the broadcast is sufficient to decide the summary judgment question. Moreover, none of the other evidence indicates that testimony about Antar's role in the editorial process is necessary or helpful to the disposition of this motion. *See generally* DE 110.

or recklessly misstated evidence to make it seem more convincing or condemnatory than it was. *See Westmoreland v. CBS Inc.*, 596 F.Supp. 1170, 1174 (S.D.N.Y. 1984). Defendants' actions, however, do not rise to the level of any of the alleged instances of misstated evidence in *Westmoreland. See id.* at 1174–77; *see also Sharon v. Time, Inc.*, 599 F.Supp. 538, 582 (S.D.N.Y.1984) (attributing defendant's view of facts to widely respected, quasi-judicial body is evidence of actual malice).

■ Second, plaintiffs emphasize that no particular source informed ABC that Silvester was responsible for the arson and that ABC failed to investigate whether the West Palm Beach fronton was in fact underinsured. Plaintiffs contend that Rivera's spinning the arson theory out of whole cloth epitomizes reckless disregard for the truth. Evidence that a defendant failed to investigate prior to publication does not in itself prove malice. *St. Amant,* 390 U.S. at 732–33, 88 S.Ct. at 1326–27. When a publication is not "hot news," however, malice can be inferred if the investigation was grossly inadequate under the circumstances. *Hunt,* 720 F.2d at 643. ABC showed Silvester on tape stating that the damage to the fronton was worth about $8 million. The numerous documents produced in this case indicate that the investigation was not grossly inadequate. Moreover, the lack of a specific source for the arson hypothesis does not offend the Constitution. Members of the news media may spin their own theories so long as those propositions are not so unreasonable under the circumstances as to demonstrate malice. On the facts of this case, defendants' arson theory did not exceed the bounds of the broad protections afforded by the First Amendment where limited public figures are concerned.

■ Third, plaintiffs point to evidence that after the publication an ABC employee told an insurance investigator that the ABC legal department would not distribute a copy of the segment because "it may contain libelous matter which is not to be released to the general public." Ex. C to DE 138. The ABC employee later denied in her deposition that she had said the broadcast was libelous. The court concludes that this disputed fact is not material. The statement of an ABC employee that the legal department thought after the broadcast that it might contain libelous material does not, without more, prove that defendants had such thoughts at the time the segment was aired, which is the critical time for purposes of establishing malice. *See Bose Corp. v. Consumers Union, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (evidence must establish that defendant "realized the inaccuracy at the time of publication").

■ Fourth, plaintiffs note a memorandum prepared several weeks before the broadcast by ABC associate producer Susan Steiger. Rivera and Cohen received copies. The memorandum listed a "cast of characters" divided into "good guys" and "bad guys." The former included Ziskis, a reporter, disgruntled former fronton employees, and law enforcement investigators. The latter listed systems bettors, two alleged organized crime figures, and several fronton owners including Silvester. *See* ex. B to DE 141. Plaintiffs have submitted the affidavit of David A. Klatell as expert testimony that the memorandum proves that from the outset ABC sought to support its thesis rather than to report the truth. Klatell also states that the interview subjects were manipulated to support defendants' thesis; "good guys" were rehearsed and allowed to retape, while the "bad guys" were given no such opportunity. The videotape outtakes confirm this tactic.

The court does not believe that these purported transgressions into bad journalism rise to the level of constitutional malice. A reporter's bias, "in the sense of a determined effort to confirm a previously formed suspicion," does not establish malice. *Westmoreland,* 596 F.Supp. at 1174; *accord Coughlin v. Westinghouse Broadcasting and Cable, Inc.,* 603 F.Supp. 377, 386 (E.D.Pa.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986).

The extensive depositions of defendants and their employees contain no evidence that the Steiger memorandum appreciably affected the investigation. The coaching of certain interviewees is also constitutionally benign. "The qualified immunity of *New York Times* protects the press against a public official's libel action based on lack of thoroughness or predisposition as long as the defendant is not shown to have published recklessly or in the belief that its assertions were false." *Westmoreland*, 596 F.Supp. at 1173; *see also Coughlin*, 603 F.Supp. at 388.

▪ Fifth, plaintiffs complain that defendants edited detailed refutations of the broadcast's allegations from the interview of William Dawes, attorney for a fronton owner. Having viewed these outtakes, the court finds that their omission does not contain the alleged distortions, dishonesty, and willful falsity present in *Westmoreland*. A reporter is not "required to accept denials of wrongdoing as conclusive." *Westmoreland*, 596 F.Supp. at 1174. Defendants' failure to give equal time does not, in these circumstances, prove malice. *See* DE 161, ex. P–39–Cohen.

▪ Plaintiff's final proffered instance of malice is Rivera's reporting that Silvester refused to speak with ABC. Plaintiffs have submitted evidence that Silvester was never contacted by ABC and that ABC was not told that Silvester refused comment. Although this evidence raises a fact question, the dispute is not a material one because the court concludes that this evidence, taken together with the other proffered evidence of malice, is not sufficient to demonstrate a triable issue of fact. Because the record could not support a reasonable jury finding that plaintiffs have shown actual malice by clear and convincing evidence, final summary judgment on Counts I, II, and III of the complaint in favor of defendants is appropriate. *See Anderson*, 106 S.Ct. at 2514.[4]

**4.** It is not necessary, therefore, to address defendants' argument that the 20/20 broadcast is

## V.

### TORT COUNTS

▪ Counts IV, V and VI of the complaint allege the torts of intentional infliction of severe emotional and mental distress, interference with advantageous business relationships, and interference with prospective economic advantage, respectively. Counts IV and VI set forth no facts but merely reincorporate the allegations in the libel counts. As such, Counts IV and VI do not set forth independent torts and therefore must be dismissed. *See Boyles*, 431 So.2d at 636. Count V additionally alleges that defendants' conduct delayed the reconstruction of the West Palm Beach fronton and interfered with plaintiffs' business relationships in Florida, Rhode Island, and throughout the country. Assuming without deciding that this count states an independent claim for relief, summary judgment on this count is appropriate because there is no evidence of intentional and unjustified interference. *See Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127–28 (Fla.1985).

## VI.

### CONCLUSION

All claims and parties having been disposed of, it is therefore

ORDERED and ADJUDGED that defendants' motion for final summary judgment (DE 118) is granted. It is further

ORDERED and ADJUDGED that defendants' motion for partial summary judgment on the issue of punitive damages (DE 123) and the motions to compel of both parties (DE 107, 108, 109, 121, 126) are denied as moot. It is further

ORDERED and ADJUDGED that this cause is hereby dismissed with prejudice as against all defendants. Each party will bear its own costs and attorneys' fees. The Clerk is directed to close this file.

privileged under Florida common law.

## APPENDIX

(The following is a somewhat imperfect transcript of the 20/20 broadcast.)

DOWNS: Yes. Thank you, Tom. Next, a sweeping investigation into a big time betting scandal. Geraldo Rivera on the most impossible odds against winning money on the fast moving, fast growing game of jai alai.

\* \* \* \* \* \*

DOWNS: Jai alai, it's a fast growing sport in this country and it generates a lot of money because, like horse racing, you bet on it. Well, a suspicion that all is not level led us to probe and tonight on 20/20 Geraldo Rivera has finished that investigation, a burgeoning jai alai scandal that is just breaking across the country.

GERALDO RIVERA: Thank you, Hugh. Jai alai is currently played in four different states across the country: Florida; Connecticut; Rhode Island; and in Nevada. But, a dozen other states are currently considering whether or not to permit the sport to begin operating as a means of generating increased tax revenues.

Now, the reason it's so controversial is that jai alai, at least as it's played in this country, is basically designed for one essential purpose, and that's to generate big money from legalized gambling, but what we're about to show you is a story of spreading scandal. You'll hear allegations of fixed games and other apparently illegal activities. Players and professional gamblers have already been indicted but one caution before we begin this report. Although serious allegations will also be made concerning owner involvement, law enforcement authorities do not feel there is, as yet, sufficient evidence to bring criminal charges against anyone in jai alai management. Those investigations are continuing. And here is ours.

(MUSIC)

ANNOUNCER: Spin, speed, strategy and the lurking danger of a rock hard ball, these all combine to help make jai alai the world's most exciting ballgame.

(MUSIC)

RIVERA: For jai alai bettor Harvey Ziscis there's no question but that the game was exciting.

HARVEY ZISCIS: I received a threatening phone call saying that if I talked anymore that I would end up in the Connecticut River with cement shoes.

RIVERA: Lieutenant Richard Hurley, Connecticut's chief investigator of legalized gambling.

LIEUTENANT RICHARD HURLEY: Harvey Ziscis was the catalyst that really, you know, started the entire investigation. He came to me approximately two years ago and gave me some very good information regarding the professional system bettors in Connecticut.

ZISKIS: The public is being ripped off and it's time for somebody to stop these people from manipulating people and the money.

RIVERA: For the past two years, Harvey Zisca has been trying to blow the whistle on the five hundred million dollar jai alai industry, an industry he once worked for. While running the food concessions at the Hartford, Connecticut, jai alai arena, which in jai alai are called frontons, Harvey figured out the sophisticated mathematical betting system used by insiders to legally beat jai alai's long odds but when he tried to put his newly learned system into action Harvey discovered that so-called systems betting was a closed preserve, not open to outsiders, or upstarts like himself.

His attorney, Alex Goldfarb.

ALEX GOLDFARB: He's a professional gambler. He's no innocent. I didn't represent an innocent. He wanted in. They didn't say—they said no you can't come in. You know the story behind Harvey? The frameup? The frameup is, look, you can't be—be part of a system. You can't be a systems player. He learned all about systems playing while he worked for them. He got inside and found out all about it. So, he left his job and says, O.K., I—I want to play like any other member of the public. Uh-uh, Harvey, no, this is reserved for

management and our systems players that we choose, and of course management gets a piece of the action.

RIVERA: Harvey found himself accused of trying to defraud the Hartford fronton. As a result of that action by management, he was permanently barred from the premises. Eventually cleared of the charge, he decided to apply the modern philosophy of not getting angry but getting even. Harvey began a one man campaign to expose the seamy side of the world's fastest ball-game.

He found an ally in investigative reporter Ted Driscoll of "The Hartford Current" newspaper. Using Harvey as his principal source, Driscoll began unraveling the complicated skeins.

TED DRISCOLL: What we found is that a clique of professional gamblers is controlling the betting pools at most of the frontons, appears to be fixing games and is really ripping off the ordinary bettor. It has to be in the millions at every fronton that I looked at, in the millions and millions. It is an enormous ripoff.

ZISKA: From what I've seen and what I know and can prove jai alai is a totally corrupt industry. There is a conspiracy existing among the fronton management, fronton employees, the systems bettors and organized crime. Systems betting isn't illegal but the systems bettors that have been betting in the frontons today, the so-called Miami syndicate, what they are doing is illegal. They are getting illegal assistance from the fronton management. They're getting—they're able to buy tickets without any money.

The fronton management is holding their tickets for them, separating the winners from the losers. They're getting access to the ninety second printout computer records which tell them what the other people are betting in the fronton which gives them the opportunity to actually control the betting in each fronton.

RIVERA: Even with the intensified investigations and the growing controversy surrounding the jai alai industry, illegal systems betting is apparently still going on. Last night, using a hidden camera, we caught two systems bettors in action right here at the Daytona Beach jai alai fronton.

According to Ziskis the man standing at the betting window behind me is actually a well-known employee of the so-called Miami syndicate. That's the name given a loosely connected group of big-time gamblers with close connections with fronton management and employees.

We watched the man through six jai alai games. He bet hundreds of dollars. The ticket puncher worked only for him, punching out tickets from a long list. On only one occasion did we see any money, just three bills transferred between the bettor and the puncher. So, for five games, he was apparently allowed to bet on credit. The puncher held the tickets for him, later separating the winning tickets from the losers.

Under Florida law, this kind of extraordinary preferential treatment is illegal. At the betting area on the first floor of the fronton, Ziska identified another alleged runner for the Miami syndicate, a blonde woman also given special treatment by the ticket puncher. Earlier that week, at the jai alai fronton in Newport, Rhode Island, we followed another systems player in action, again, according to Ziska, another runner for the Miami syndicate. The young man was wagering hundreds of dollars on each game but had so little interest in the actual contest that he didn't even bother watching, but he was very conscientious about collecting his almost inevitable winnings. There are sixteen jai alai frontons in four states: Florida; Rhode Island; Nevada; and Connecticut. The so-called Miami syndicate is said to be active in every one of them. William Drakely, chief analyst, Connecticut State Gaming Commission.

WILLIAM DRAKELY: I would have to conclude that we're dealing with a group of people, sophisticated, highly organized, that control the flow of money in and out of the jai alai industry.

RIVERA: Lou Wilson, special agent, Florida Department of Law Enforcement.

LOU WILSON: We have systems betting taking place in Florida as well as Connecticut and Rhode Island.

AUSTIN MCRIGGIN: Yes, there's no question that there's a large group of professional systems bettors working in Connecticut, most of them based in north Miami.

RIVERA: Austin McGuigan, Connecticut States Attorney.

MCGUIGAN: We're looking into irregularities in jai alai but so far we've alleged that some systems bettors were involved in—in fixing jai alai games.

RIVERA: Although allegations of game fixing have been frequent in the past, no jai alai player has actually ever been indicted until now. This month, three members of the Miami syndicate were arrested and charged with fixing and conspiring to fix games at the Milford, Connecticut, jai alai fronton.

One of those arrested was Paul Kimona, a big-time gambler, alleged to have won hundreds of thousands of dollars from rigged games. Connecticut's police have so far been unable to locate Juan Guardino, a player indicted along with the three gamblers for throwing games. Guardino has apparently fled the country.

According to Lieutenant Hurley, Kimona is now the key to the investigation.

HURLEY: But I'm tell you the way it is, nobody's got a handle on jai alai, and what I know about it—I'm no expert, I know about 5% of it and you know who's the expert? Kimona right now, he's the expert and when he's done, he gets done talking, he gives me the next one.

RIVERA: Jai alai is a relative newcomer in Connecticut but it's been a fixture in Florida for over forty years, and in all that time the game has never been seriously tainted by scandal. Our investigation suggests the reason is that Florida has never effectively policed the $1.5 billion legalized gambling industry.

William Irwin is the chief state auditor at the Dania fronton in Florida. What he told us suggests that his superiors just didn't want to hear bad news about the sport that earns the state a hundred million dollars a year in tax revenues.

As the chief state auditor of the Dania fronton, did you ever see evidence of player fixing?

WILLIAM IRWIN: Yes, I did.

RIVERA: Tell me about it.

IRWIN: Well, I could notice from my printout sheets—from the IBM printout sheets that—that somebody was betting—betting large sums, approximately three thousand dollars, on ten dollar quinellas in the race—in the game and that invariably certain players were left out.

RIVERA: Left out of this player ...

IRWIN: Left out of this player system. He never bet these teams, and invariably they never—they never won. There were occasions ...

RIVERA: The people—the people he didn't bet on never won.

IRWIN: Never won.

RIVERA: So it was obvious he knew something.

IRWIN: I would think so.

RIVERA: How many players were involved?

IRWIN: Five.

RIVERA: Who was the bettor?

IRWIN: Paul Kimona.

RIVERA: Is there any way that Mr. Kimona could have won this money just by sheer good luck?

IRWIN: No. No way. It was too consistent.

RIVERA: And this pattern lasted from 1975 until ...

IRWIN: February, '78.

RIVERA: How much money was wagered on a typical night?

IRWIN: It depends on how many games. At that time they were going to three or four games and betting three thousand a

game. So, it would be ten—nine, twelve thousand.

RIVERA: Per night.

IRWIN: Right.

RIVERA: And how much could they win?

IRWIN: Well, in each game, fifteen, two thousand dollars.

RIVERA: As you'll see, this story is filled with coincidences. The first is the identity of Bill Irwin's boss during the time he and others reported various allegations of irregularities within the jai alai industry. His boss was J. Patrick McCann, then director of the state division of paramutuel wagering. Now, McCann is head of the National Jai Alai Association. When you were director of the division of paramutuel wagering, were you ware of any cases of player fixing?

J. PATRICK MCCANN: There were no—no case—no cases of player fixing that came to my attention while I was there.

RIVERA: None at all.

MCCANN: None at all.

RIVERA: We have some memoranda sent to you by W.C. Lewis, who was one of your employees.

MCCANN: Chappy Lewis, right.

RIVERA: In December of 1975, I'll just read something to you, "To J. Patrick McCann, director, from W.C. Lewis." The date is 12/21/75. This is quoting from the memo. "Subject, allegations sports palace at Melbourn, Florida. A player had overheard two other players discussing the fix—the fixing of a game at the sports palace. Two players have admitted to this conversation and there are supporting documents here. Then he told me about the fixing of the sixth game. Torrez came to me and said 'I will give to you later what I owe you.'" All these documents talk about a fix.

MCCANN: Yeah, well, I recall—I recall that Melbourn case very well. That incidentally was first reported by the Melbourn management and my recollection of that situation was not that the game was being—the games were being fixed, but the report that we got originally from the management was that players were not playing up to the best of their ability.

RIVERA: What's the difference?

MCCANN: Well, the players, if players do not play up to the best of their ability they can be fined and suspended. Players for different reasons will not, you know, play their best. If a player doesn't play—play up to his ability, it isn't necessarily because a game is being fixed. He just may not want to, you know, win for any particular reason.

RIVERA: In the more recent case of alleged player fixing, both frontons involved, Milford, Connecticut, and Dania, Florida, are owned by the Saturday Corporation. William Daws is the organization attorney.

WILLIAM DAWS: Actually, you don't have any scandal in jai alai. In my opinion, this has been probably one of the best sources of entertainment, excitement and the cleanest sport that you've had in the state of Florida.

RIVERA: But it would seem as if the confidence of the men who run the Dania jai alai fronton here in Florida and the other up in Milford, Connecticut, is not exactly well-placed. ABC News has learned that one of the players allegedly involved in the game fixing, a man named Manuel Solaria, who plays under the name Artia, has turned state's witness. He's already given testimony against the four players already named in the betting scandal. And, he's named nine others as well. It would seem as if the hard times for the jai alai industry are just beginning.

Hard times have already hit the jai alai fronton in west Palm Beach. It was partially destroyed by fire last Christmas night. At first, the fire was regarded as serious setback by the investigator. Betting records that could have shown a link between fronton employees and the Miami syndicate were apparently destroyed in the blaze.

Then, police received an anonymous call that the records had not been destroyed by the fire after all. After three days of digging, they were uncovered, a mountain of evidence someone had tried to bury. Captain Sheed of the Palm Beach Sheriff's Office. Captain Sheed, has your investigation revealed the possibility of arson on that fire Christmas night?

CAPTAIN SHEETS: We've definitely established that it was arson.

RIVERA: It was intentionally burned down, that fronton.

SHEED: Yes, that's correct.

RIVERA: fortunately for the owner, Arthur Sylvester, all this reconstruction isn't costing him a penny, because the building was heavily insured. Mr. Sylvester had an insurance policy worth eight million dollars.

ARTHUR SYLVESTER: We still have to see what the damages are. I won't know exactly until I get into the building, but if it was all demolished right now I'd say eight million dollars if we have to tear the whole thing down.

RIVERA: Isn't that an interesting coincidence, that the amount of the insurance coverage just happened to be exactly equal to Mr. Sylvester's estimate of the damage the fire caused? And there's another coincidence. Mr. Sylvester just happened to increase his insurance coverage from four million up to eight million dollars just months before th fire occurred, and there's another coincidence. The insurance agent who sold Mr. Sylvester the policy is named Tom Roberts. Tom Roberts just happens to be the brother of Don Roberts who happens to be the manager of the West Palm Beach jai alai fronton, and wait, there's a final coincidence. Despite the sheriff's findings that the fire was definitely arson, the insurance company has paid up on the policy in full.

SHEETS: We have allegations that—of course, we have—we're still investigating and it's not been substantiated, but a manipulation of uncashed winning tickets of— giving preferential treatment to systems bettors, what we call ten percenting, where we have employees, mutuel employees, cashiers and tellers, engaging in cashing winning tickets for systems bettors for a percentage of the face value of the ticket.

RIVERA: ABC News has learned that Florida officials are preparing to initiate proceedings that could result in license revocation for Mr. Sylvester. He incidentally also refused to speak with us. There are currently fourteen different agencies, federal, state and local investigating various aspects of alleged wrongdoing within the industry. As I said, it appears that hard times for jai alai are just beginning.

The Florida paramutuel division yester- day issued that show cause order against the management of the West Palm Beach jai alai fronton, demanding to know why their license should not be revoked.

The charges are, number one, the allegedly illegal attempt to destroy those records, and secondly, the apparently illegal mishandling of paramutuel tickets. Named in that order are owner Arthur Sylvester and manager Don Roberts.

Now, incidentally, this is the first time any definitive action has been taken by any state against anyone in jai alai management. It's beginning already.

DOWNS: It is. Thank you, Geraldo.