General William C. WESTMORELAND, Plaintiff,

v.

CBS INC., et al., Defendants.

No. 82 Civ. 7913 (PNL).

United States District Court, S.D. New York.

Sept. 24, 1984.
Supplemental Opinion Oct. 9, 1984.

Dan M. Burt, David M. Dorsen, Sachs, Greenebaum & Tayler, Capital Legal Foundation, Washington, D.C., for plaintiff; Patricia A. Embrey, Kathleen A. McGinn, James A. Moody, Anthony S. Murry, Richard R. Riese, Capital Legal Foundation, Washington, D.C., of counsel.

David Boies, Stuart W. Gold, Cravath, Swaine & Moore, New York City, for defendant CBS Inc.; Robert H. Baron, Randy M. Mastro, William F. Duker, Michael R. Doyen, George Vradenburg, III, Ronald E.

Guttman, Douglas P. Jacobs, Victor A. Kovner, Harriette K. Dorsen, Lankenau, Kovner & Bickford, New York City, of counsel.

LEVAL, District Judge.

This is an action for libel. Plaintiff is General William Westmoreland, who served from 1964 to 1968 as Commander of the United States Military Assistance Command, Vietnam (MACV). Defendants are CBS Inc., and certain of its employees, officers and consultants, namely Mike Wallace, George Crile, Sam Adams and Van Gordon Sauter. The action concerns a television documentary report prepared by defendants and broadcast January 23, 1982, entitled *CBS Reports—The Uncounted Enemy: A Vietnam Deception.* This documentary dealt with the intelligence estimates of enemy strength by plaintiff's command during the Vietnam War. General Westmoreland contends the central theme of the broadcast was that he led a conspiracy to suppress and distort intelligence as to the size of the enemy force— or, more specifically, that in order to substantiate his optimistic reports on the progress of the war, General Westmoreland gave orders to his intelligence officers to underestimate the size of the enemy force in the Order of Battle.

Defendants move for summary judgment or dismissal on numerous grounds. First, CBS contends it enjoys absolute immunity dictated by the First Amendment from a libel action brought by a high public official challenging commentary on his performance of the duties of his office. CBS argues that the importance to an informed public of free commentary and criticism on the performance of duties by the highest ranks of public officials must take precedence over those persons' interests in vindicating injured reputations; that public officials of such high rank have sufficient access to the media to defend themselves without need for a libel remedy; that, regardless of the result of the suit, the mere incurrence of the expenses of defending such actions is debilitating and therefore intimidating to the press; that a libel action in such circumstances is functionally equivalent to the unconstitutional prosecution for seditious libel of the government; and finally that since the public official of highest category enjoys absolute immunity from libel actions for things he says in the performance of his duties, it is appropriate that the press and public should enjoy a corresponding absolute immunity for commenting on his performance of those duties.

■ It is undisputed since the historic ruling of the Supreme Court in *New York Times v. Sullivan,* 376 U.S. 254, 272, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), that the press enjoys a qualified immunity for such commentary on public officials. This rule bars a public official's libel action for defamatory falsehoods unless he can prove by clear convincing evidence that the defamation was published with knowledge of its falsity or in reckless disregard for its truth or falsity.

CBS urges the court to go further and, as to high ranking officials, make the immunity absolute. CBS concedes there is no precedent giving direct support to its contentions. No case establishes such an immunity. Nor has any ruling directly rejected these contentions. The libel action by very high public officials is an unusual phenomenon. Plaintiff, needless to say, vigorously opposes defendants' arguments and points out, among many arguments, that he no longer held public office at the time of the broadcast.

I consider it inappropriate to rule in advance of trial on these novel contentions. The consideration of such far reaching changes in law, not only in the district court but in higher courts on review, is better based on the experience of a full trial record. Accordingly, these branches of defendants' motion are denied with leave to renew at the conclusion of trial.

Next CBS contends its charges were absolutely privileged as expressions of "opinion." *See Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing*

*Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Hotchner v. Castillo-Puche,* 551 F.2d 910 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777 (1977); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). *See also Gertz v. Robert Welch Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974).

This doctrine has been held to protect the description of a tough negotiating stance as "blackmail", *Greenbelt, supra;* a "scab" as "traitor", *Letter Carriers, supra;* a journal as "fascist", *Buckley, supra;* a biographer as a "toady" and "hypocrite", *Hotchner, supra;* and a judge as "incompetent," *Rinaldi, supra.*

On the other hand, it has been ruled inapplicable to the assertion in *Buckley* that the plaintiff habitually made false libelous accusations; and in *Rinaldi* that the judge had probably engaged in corrupt acts. The limits of the doctrine are explained in *Cianci v. New Times Pub. Co.,* 639 F.2d 54 (2d Cir.1980) where it was ruled inapplicable to the publication of a charge of rape. Judge Friendly there made clear that the doctrine has no bearing on a charge of commission of criminal acts.

■ CBS concentrates on its use of the word "conspiracy" in the broadcast, arguing that this is the kind of characterization that falls on the protected side of the opinion privilege. If this controversy centered

on the use of the word "conspiracy," CBS' position might well have force. But that characterization is really peripheral. The heart of plaintiff's case centers on the accusations that General Westmoreland ordered, or prevailed upon, his officers to draw dishonest conclusions and give false reports evaluating intelligence data. An accusation of such misconduct is clearly outside the protection of the "opinion" rule. And it is irrelevant to the applicability of the rule that in saying what it said CBS was expressing its opinion. *Cf. Cianci, supra,* 639 F.2d at 64–66.

■ The principal bulk of defendants' voluminous briefs is dedicated to the point that summary judgment should be granted because what was stated in the documentary was true. To this contention, it is sufficient answer that plaintiff proffers evidence to the contrary. I express no views on the persuasiveness of the proofs offered by either side. Summary judgment must be denied if there is conflicting evidence on any substantial issue.

The most forceful branch of CBS' motion is the contention that plaintiff has failed to offer proof of such "malice" as a public figure must show to establish libel. "Malice" in this context does not carry its dictionary definition; it is the word of art, used in the Supreme Court's *New York Times v. Sullivan* decision, to signify the making of a defamatory publication either in the belief that it is false or with reckless disregard whether it is true or false. To diminish confusion with ordinary and common law malice, I refer to this element as "constitutional malice".[1]

---

**1.** This element is generally identified as "actual malice." *New York Times v. Sullivan, supra* 376 U.S. at 279, 84 S.Ct. at 726; *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Since what is meant is something distinctly different from malice in its everyday sense of spite, ill will or hatred, the addition of the adjective "actual" seems to me to do little to avert confusion. I do not suggest that "constitutional malice," as used in this opinion is much of an improvement.

The possibility of confusion is not so pernicious in written judicial opinions, since these are read primarily by lawyers and make clear that the words are used only as a code symbolizing the element. The problem is far more serious, however, in the context of a jury trial where the use of the term malice, or worse—actual malice, carries a significant potential for prejudice. For example, it is clear that a reporter is not liable for accusations that are responsibly researched and sincerely believed, no matter the extent of his ill will toward the subject of the accusation. But if the jurors are repeatedly told throughout trial that evidence is being received

Defendants contend that the charges made in the broadcast were supported by so extensive and lengthy an investigation and by so many apparently reliable sources that defendants cannot be found to have published with constitutional malice.

If that were the end of the inquiry, defendants' position would have great force. For it is well documented that in preparation of the broadcast CBS conducted an investigation of approximately a year's duration, interviewed over 80 persons, many of whom had participated in the events in question in 1967 and 1968, and found a number of seemingly knowledgeable and reliable witnesses who confirmed and supported the broadcast's premise. In making the documentary CBS employed as its principal consultant defendant Sam Adams who had been a CIA intelligence analyst in the period in question. Adams had been an active participant in the Order of Battle controversy that raged in 1967 and 1968. He had long held and vigorously promoted the views expressed in the documentary. He had done considerable research to document his views, conducted many interviews, taken extensive notes and written an article on the subject published in Harpers Magazine in 1975.

Plaintiff argues that, notwithstanding the duration and bulk of CBS' investigation, it was biased and inadequate. He contends the selection of interviewees, the framing of questions and the handling of witnesses were designed to confirm a hostile premise rather than to find the truth. He contends further that witnesses, who were not privy to the facts and offered only speculative conclusions, were treated as authoritative if their views supported CBS' premise, while the contrary views of witnesses who possessed firsthand information were ignored by CBS.

■ Without expressing any opinion on the correctness of the plaintiff's contentions about CBS' conduct, they are probably insufficient in the context of these facts to establish constitutional malice. They do not demonstrate that defendants published their charges believing them to be false or with reckless indifference to their truth or falsity. The qualified immunity of *New York Times* protects the press against a public official's libel action based on lack of thoroughness or predisposition as long as the defendant is not shown to have published recklessly or in the belief that its assertions were false. It is difficult to conceive of an investigation conducted in so thor-

on the issue of "malice," they are likely to find an unwarranted liability notwithstanding the few instances when the court instructs at length. *Cf. Greenbelt, supra,* 90 S.Ct. at 1539–1540.

The prejudice works in the other direction in favor of the reporter who has no personal ill will and could care less whom he defames as long as he defames someone; the plaintiff's burden of proving that reporter's *recklessness* to the jury will unfairly increase if the element is disguised under the label "malice".

Justice Brennan recognized the danger of using the "actual malice" term in the presence of a jury and suggested it be avoided. See *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52 n. 18, 91 S.Ct. 1118, 1124 n. 18, 29 L.Ed.2d 296 (1971).

In this case, use of the term "actual malice" may well cause serious prejudice to the defendants. For it is undisputed that the defendant Adams has persistently harbored and advanced his accusations since 1967; that in 1973 he filed a complaint with the U.S. Army Inspector General charging General Westmoreland with court martial offenses; that defendant Crile joined Adams' camp as early as 1975 when he edited Adams' article for Harpers Magazine; and that

CBS undertook its research at Crile's suggestion with the objective of confirming Adams' accusations through interviews of various military officers identified by Adams. None of that, however, proves constitutional malice if defendants reasonably believed the truth of their accusations.

Because of the likelihood of prejudice, I have suggested to counsel that a more neutral word be chosen, preferably on mutual agreement, to signify this element of the plaintiff's case. A candidate to be considered which is twice mentioned in the Supreme Court's *New York Times* opinion, 376 U.S. at 269, 283, 84 S.Ct. at 720, 727, is the "constitutional limitation." The term is certainly not descriptive of the ingredients of the element, but the problem with more descriptive formulations is that they tend to favor one side or the other. This term enjoys the advantage of neutrality.

Other terms to be considered are "state of mind", "deliberate or reckless falsity", "abuse of privilege" and "impermissible basis". I request counsel to consider these suggestions, discuss them and report to the court. I welcome any additional suggestions counsel may advance.

ough a fashion that it would not be vulnerable to after-the-fact charges of inadequacy. The press is not obliged to satisfy the Platonic ideal of investigation to qualify for summary judgment on the issue of constitutional malice. And as for bias of the reporter, in the sense of a determined effort to confirm a previously formed suspicion, this does not establish malice. *Cf. Greenbelt, supra,* 90 S.Ct. at 1539–1540; *Cianci, supra,* 639 F.2d at 66; *Nader v. de Toledano,* 408 A.2d 31, 40 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Reporters of course investigate where their suspicions lie. A previously formed belief rebuts as much as it establishes constitutional malice, as it tends to demonstrate sincerity.

Getting the truth from a reluctant witness often requires either cajoling and flattery or a rough cross-examination. The use of such tactics is often necessary to arrive at the truth. By itself, it does not demonstrate disregard for the truth. Nor is the reporter required to accept denials of wrongdoing as conclusive, or to prefer them over apparently creditable accusations. *See Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 121 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

If plaintiff's position were supported only by such contentions of insufficient thoroughness, bloodhound-determination, and bias, defendants might well be entitled to summary judgment where they could show they had relied after investigation on apparently creditable sources.

Plaintiff, however, also asserts contentions of dishonesty and willful falsity in the editing and presentation of evidence. These contentions concern arguable deliberate misstatements of the evidence supporting the broadcast thesis.

Although a reporter may have sufficient evidence of his charge to foreclose any material issue of constitutional malice for its publication, he may nonetheless make himself liable if he knowingly or recklessly misstates that evidence to make it seem more convincing or condemnatory than it

is. If, for example, a publication asserts falsely and without basis that the charge was confirmed by an eyewitness, if in the editing process it distorts statements of witnesses so that they seem to say more than in fact was said, or if it falsely overstates a witness' basis for his accusation, these might raise triable issues of constitutional malice in spite of a sufficient foundation for the constitutionally protected publication of the basic charge. *Cf. Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); *Edwards v. National Audubon Society, Inc., supra,* 556 F.2d at 120; *Nader v. de Toledano, supra,* 408 A.2d at 51–54.

Instances alleged to involve knowingly (or recklessly) misstated evidence include the following:

a. *Col. Hawkins' characterization of figures:* Colonel Gaines Hawkins was a member of the MACV intelligence team who in 1967 was sent as part of a delegation to represent MACV at a conference of the National Intelligence Estimate Board. The conference was held to try to resolve differences of opinion among various agencies on the enemy strength. When CBS interviewed him in preparation of the broadcast, Hawkins had said:

> *"Now prior to this when we had the old figures that we inherited from the South Vietnamese forces,* there was never any reluctance on my part to tell Sam [Adams of the CIA] or anybody else who had a need to know, that these figures were crap. They were history. They weren't ... they weren't worth anything...."* (Emphasis supplied.) (JX 9, p. 36)

In editing this statement for the broadcast, CBS excised the underlined portion and presented the balance in a context suggesting that Hawkins was applying the labels of "crap," "history" and worthless to the figures that he and the MACV delegation were sponsoring at the NIE conference. Plaintiff contends that Hawkins' derogatory description in fact referred to a different set of figures—older figures that

had earlier been provided to MACV by the South Vietnamese forces.

Plaintiff contends by so editing and distorting Hawkins' statement, CBS gave it a different meaning and made it seem as if an important member of General Westmoreland's intelligence staff was making an accusation he had in fact not made. Plaintiff contends this was a deliberate distortion, a knowing falsification of evidence and, therefore, an instance of constitutional malice.

b. *Misdescription of Col. Hamscher's Statement and Status.* The broadcast contained the following passage involving Colonel George Hamscher:

WALLACE: CBS REPORTS has learned that Colonel Hawkins was in fact carrying out orders that originated from General Westmoreland. Westmoreland says he doesn't recall these orders. But the head of MACV's delegation told us that General Westmoreland had, in fact, personally instructed him not to allow the total [estimate of enemy strength] to go over 300,000.

CRILE: Wasn't there a ceiling put on the estimates by General Westmoreland? Weren't your colleagues instructed, ordered, not to let those estimates exceed a certain amount?

COLONEL GEORGE HAMSCHER: "We can't live with a figure higher than so and so"—

CRILE: Three hundred thousand.

COLONEL HAMSCHER: —is the messa—is the message we got.

WALLACE: Colonel George Hamscher was one of several members of the military delegation troubled by having to carry out General Westmoreland's command position. (JX 1, p. 11)

Plaintiff contends that this passage would be understood by the viewer as asserting that Hamscher had been the "head of [Westmoreland's MACV] delegation" and told CBS "that General Westmoreland had, in fact, personally instructed him not to allow the total [estimate] to go over 300,000". Hamscher was not the head of the MACV delegation, nor even a member

of it, nor even under General Westmoreland's command. He was an intelligence officer assigned to Admiral Sharp, the Commander-in-Chief, Pacific (CINCPAC), who participated as a representative of the Defense Intelligence Agency (DIA) in multi-agency meetings with MACV intended to arrive at a consensus on enemy strength. Moreover, Hamscher did not state that he had received such orders from General Westmoreland.

In the material following the passage quoted above, Hamscher is arguably described incorrectly in several places as a member of General Westmoreland's command, even as his chief of staff, and it is arguably further suggested that his motive in arbitrarily cutting enemy estimates was to please "his commander"—General Westmoreland.

These passages are as follows:

WALLACE: ... CBS REPORTS has learned that in the midst of the National Intelligence Estimate, General Westmoreland's representatives met here at the Pentagon and commenced arbitrarily to slash MACV's own official estimates of Viet Cong units. It may be that Westmoreland knew nothing about these specific cuts, but they were carried out by his officers, who were attempting to keep the total at the level dictated by their commander. One of those who reluctantly participated in that cutting was Colonel George Hamscher.

     \*     \*     \*     \*     \*     \*

COLONEL HAMSCHER: That was—it was a group grope.

CRILE: And it was a group grope to do what? To fake figures?

COLONEL HAMSCHER: To arrive—to arrive at a set of figures that MACV could live with.

     \*     \*     \*     \*     \*     \*

CRILE: Is it fair to say that you got together and went unit by unit and arbitrarily decided to reduce the numbers of VC enemy in those categories?

COLONEL HAMSCHER: The operative word being "arbitrarily"? Ye-Yes.

\*     \*     \*     \*     \*     \*

GENERAL WESTMORELAND: I didn't do that. . . .

WALLACE: Well, your—people in your command did.

\*     \*     \*     \*     \*     \*

COLONEL HAMSCHER: It was lousy strength estimation. It was shoddy. But we did it.

GENERAL WESTMORELAND: Now, who actually did the cutting, I don't know. It could have been my—my chief of staff. I don't know. But I didn't get involved in this personally.

COLONEL HAMSCHER: This boils down to another one of the uncomfortable little jobs that you do for your commander. And these vary in degree.

WALLACE: The battle between MACV and the CIA went on for weeks. . . . (JX 1, pp. 14–15)

Plaintiff contends Hamscher was misidentified as a member of plaintiff's command and that this was a deliberate distortion designed to make Hamscher's remote accusatory speculations seem like reliable first hand information from an insider— "the head of MACV's delegation," General Westmoreland's "chief of staff."

In answer CBS argues that "Colonel George Hamscher was identified on the broadcast as exactly what he was: 'One of several members of the military delegation' to the August 1967 SNIE Conference in Washington." (CBS Reply, p. 88) But no discussion is directed to whether the other passages quoted above misidentify Hamscher, whether any such misidentification was intentional or inadvertent, or whether it had any significant impact on the substance of the broadcast.

   c. *The McChristian hypothetical.* Another instance involved the editing of the interview of General Joseph McChristian, who had been General Westmoreland's J–2, or Chief of Intelligence until June 1967 when he was given the command of an armored division. General McChristian had found and had reported a constantly increasing enemy strength during his tenure in Saigon. There was speculation in the press at the time that his transfer was occasioned by Pentagon displeasure over his continually increasing estimates. General McChristian believed General Westmoreland was disturbed by the large increase in the intelligence figures and concerned that the release of those figures "would create a political bombshell" (JX 10, p. 31). General McChristian, however, never stated that General Westmoreland had given orders to hold down the estimate. To the contrary, he firmly denied that any such thing had happened. In his interview by producer George Crile he was asked a hypothetical question how he would characterize an order to place an arbitrary ceiling on the estimate of enemy strength. He answered that such an order would constitute "falsification of the facts." When this segment of his interview was shown on the program (shortly following the passage quoted above that seemed to attribute to Hamscher the assertion that he had received such an order from General Westmoreland), it was preceded by an introduction by the program narrator, Wallace, saying,

WALLACE: Colonel Hawkins assumes full responsibility for his actions. But we went to General McChristian, his [Westmoreland's] old intelligence chief, to ask what we should think of General Westmoreland's instructions.

CRILE: To put a ceiling on enemy strength estimates, to tell an intelligence operation that it is not permitted to report enemy strength estimates over a certain number—

GENERAL McCHRISTIAN: Uh-hmm.

CRILE: —what does that constitute, sir?

GENERAL McCHRISTIAN: From my point of view, That is falsification of the facts. (JX 1, pp. 11)

Plaintiff contends that, because of Wallace's reference to "General Westmoreland's instructions," the audience would have understood this passage as McChristian's acknowledgement that Westmore-

land had given such an order. It is undisputed that General McChristian said no such thing.

The defendants contend the broadcast creates no misleading impression but makes clear that McChristian is addressing himself to a hypothetical question.

Whether the broadcast conveys a false message and if so whether the false presentation was either deliberate or reckless are questions appropriately submitted to a jury.

d. *Misattribution of a cable.* During Wallace's interview of General Westmoreland, in a passage that became part of the broadcast, the following questioning occurred:

> WALLACE: ... Isn't it a possibility that the real reason for suddenly deciding in the summer of 1967 to remove an entire category of the enemy from the Order of Battle, a category that had been in that Order of Battle since 1961, was based on political considerations?
>
> GENERAL WESTMORELAND: No, decidedly not. That-that-
>
> WALLACE: Didn't you make this clear in your August 20th cable?
>
> GENERAL WESTMORELAND: No, no. Yeah. No.
>
> WALLACE: I have a copy of your August 20th cable-
>
> GENERAL WESTMORELAND: Well, sure. Okay, okay. All right, all right.
>
> WALLACE: -spelling out the command position on the self-defense controversy.
>
> GENERAL WESTMORELAND: Yeah.
>
> WALLACE: As you put it in the cable, you say the principal reason why the self-defense militia must go, quote, was "press reaction". That cable, dated August 20th, 1967, spelled out General Westmoreland's predicament: "We have been projecting an image of success over the recent months. The self-defense militia must be removed," the cable explained, "or the newsmen will immediately seize on the point that the enemy force has increased." The cable went on to say that "No explanation could then pre-

vent the press from drawing an erroneous and gloomy conclusion." (JX 1, pp. 13–14)

The cable to which Wallace referred, however, was not General Westmoreland's. It was sent from Saigon by General Creighton Abrams, the Deputy Commander of MACV, while Westmoreland was away, a fact concededly known to the makers of the documentary.

Defendants' reply brief does not answer the contention that this was a willful falsification. Perhaps counsel considered it insignificant, in view of the fact that General Westmoreland had sent a cable expressing his agreement with General Abrams.

I state no view on the importance of the incident, but the question arises whether the inaccurate attribution of the cable to General Westmoreland was a knowing falsification of evidence designed to strengthen CBS' case against him.

\* \* \*

■ In my opinion, the instances reviewed above sufficiently raise triable questions of knowing or reckless falsity to foreclose summary judgment on the issue of constitutional malice. I, therefore, need not review or discuss numerous other contentions made by plaintiff.

This ruling expresses no view as to whether the items specified would be sufficient to sustain a verdict in plaintiff's favor, for that is not the issue before me. The issue raised by the motion is whether defendants have shown there is "no genuine issue of material fact." Rule 56, Fed. R.Civ.P.

Defendants contend, citing language from *Yiamouyiannis v. Consumers Union of the United States*, 619 F.2d 932, 940 (2d Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980), that summary judgment must be granted unless the court concludes that plaintiff's evidence is sufficient to sustain with convincing clarity a finding of constitutional malice. See also *Nader v. de Toledano, supra.* Although *Yiamouyiannis* indeed seems to say this, the statement is a dictum that seems to

**1178**

overlook an important distinction between standards for granting and denying of summary judgment.[2]

*Yiamouyiannis* involved a *grant* of defendant's motion for summary judgment. The case did not raise the question of the standard for *denying* summary judgment. There is no question a court may not grant summary judgment unless the moving party demonstrates that there is no genuine issue as to any material fact—or, in other words, that the opposing party cannot win. But it does not follow that to win a denial of summary judgment the opposing party must demonstrate that his evidence is sufficient to sustain a verdict.

It is well recognized that while the grant of summary judgment involves a non-discretionary ruling of law, denial of the motion may involve a discretionary judgment that the sufficiency of the opposing party's proofs cannot be properly assessed without full trial. See J. Moore, 6 *Federal Practice* (Part 2), ¶ 56.15[6], p. 56–603–604 (2d ed.); C. Wright, A. Miller & M. Kane, 10A *Federal Practice and Procedure*, § 2728, pp. 187–88 (2d ed.); *Perma Research & Development Co. v. Singer Co.*, 308 F.Supp. 743, 750 (S.D.N.Y.1970).

This ruling says no more than that defendants have failed to demonstrate the absence of a genuine issue of material fact.

Defendants' other contentions are rejected. Their motion is denied. I thank counsel on both sides for most interesting, thoroughly researched and well prepared briefs.

SO ORDERED.

### SUPPLEMENTAL OPINION

After consideration of several candidates and consultation with counsel, I conclude that the term "state of mind" is the most appropriate label to use in the presence of the jury to identify the element described in *New York Times v. Sullivan*, 376 U.S. 254, 272, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) and other leading cases as "actual malice." I believe this term is more precise and less likely to inflict prejudice than the others considered.

SO ORDERED.

---

**2.** The dictum seems inconsistent with the holding of *Yiamouyiannis* that standards for summary judgment are no different in libel cases than in other cases, as well as with the differing burdens of proof between a defendant's motion for summary judgment and a plaintiff's proffer of proof at trial. There is a territory between the boundaries of a defendant's demonstration that plaintiff's proof is insufficient to sustain a verdict and plaintiff's demonstration (especially by clear and convincing evidence) that he has sufficient proof to sustain a verdict. In the territory between these bounds, the motion for summary judgment is appropriately denied without passing on the sufficiency of the plaintiff's proofs.