Gus A. CHAFOULIAS, Appellant,

v.

Lori C. PETERSON, Respondent, American Broadcasting Companies, Inc., a Delaware corp., Respondent.

No. C2–01–1617.

Court of Appeals of Minnesota.

April 30, 2002.

Michael Berens, Erin K. Fogarty Lisle, Kelly & Berens, P.A., Minneapolis, for appellant.

Kay Nord Hunt, Phillip A. Cole, Laura L. Enga, Lommen, Nelson, Cole & Stageberg, P.A., Thomas W. Tinkham, Dean C. Eyler, Dorsey & Whitney LLP, Minneapolis, for respondents.

Considered and decided by ANDERSON, Presiding Judge, SCHUMACHER, Judge, and HARTEN, Judge.

## OPINION

G. BARRY ANDERSON, Judge.

Hotel owner Gus A. Chafoulias (appellant) brought a defamation action against attorney Lori Peterson (respondent) and the American Broadcasting Companies, Inc. (ABC) (respondent) in response to Peterson's televised statements alleging appellant's knowledge of acts of sexual abuse and harassment perpetrated against his female employees by male guests at his hotel. The district court granted respondents summary judgment, reasoning that appellant was a limited-purpose public figure who could not prove by clear and convincing evidence that respondents had acted with actual malice. We agree with the district court's reasoning, and affirm. Because we affirm the decision in respondents' favor, we do not reach the immunity and privilege issues raised by respondents by notice of review.

## FACTS

In June 1996, respondent Lori Peterson brought a federal sexual-harassment lawsuit on behalf of five former employees of the Radisson Plaza Hotel in Rochester against appellant Gus A. Chafoulias, the hotel's owner, companies appellant controlled, and others. The suit claimed that between 1993 and 1995, female hotel employees were subjected to acts of sexual harassment and abuse at the hands of hotel guests from the United Arab Emirates.

The allegations of liability were premised on the contention that appellant, as an employer, was responsible for the actions of his managers and employees in ignoring, condoning, and contributing to the illegal acts of the hotel guests. The suit alleged that appellant and his employees long knew about the offensive conduct but failed to take meaningful action, including notifying the police, and that appellant used his influence to dissuade the police from investigating or prosecuting reported crimes, including rape.

The harassment suit arise from a developing and increasingly public dispute concerning the alleged sexual harassment of Rochester women by Arab males visiting Rochester to receive medical care at the Mayo Clinic. In August 1995, Peterson notified appellant that she was representing several of his former employees in a suit against appellant and the Radisson. Appellant hired a public-relations firm in anticipation of a media-relations battle over the allegations, which soon became public. Beginning in April 1996, Rochester-area newspapers and television stations began reporting on the accusations. After the suit was filed, newspaper and television coverage increased. In October 1996, respondent American Broadcasting Companies (ABC) videotaped interviews with Peterson, her clients, and appellant.

On August 6, 1997, ABC broadcast the interviews, in a substantially edited form, as "The VIP Floor," a segment of ABC's "PrimeTime Live" television program. The report contained footage of appellant saying, "I don't know if [the harassment] happened," followed by footage of Peter-

son stating, "Chafoulias knew. Chafoulias has known for years that these women were being attacked, harassed, raped."

On August 13, 1998, appellant brought a defamation action against respondents, alleging, inter alia, that Peterson's statement was made and broadcast with actual malice. Respondents claimed various immunity and privilege defenses. Extensive discovery and motion practice ensued.

The district court concluded that appellant was a limited-purpose public figure, and would have to show that respondents acted with actual malice to recover for defamation.

Both respondents moved for summary judgment on the issue of actual malice. The district court granted both motions, reasoning that the evidence in the record could not support a reasonable jury finding that appellant showed respondents' actual malice by clear and convincing evidence. This appeal followed. By notice of review, respondents claim that various immunities and privileges apply.

## ISSUES

I. Is appellant a limited-purpose public figure?

II. Did the district court err by granting respondents summary judgment on the defamation claim?

## ANALYSIS

### I.

■ Chafoulias claims he was defamed by Peterson's statement, as broadcast by ABC, that "Chafoulias knew. Chafoulias has known for years that these women were being attacked, harassed, raped." The elements of a cause of action for defamation are (1) a false and defamatory statement about the plaintiff; (2) an unprivileged publication to a third party; (3) a tendency to harm the plaintiff's reputa-

tion in the community; and (4) fault, at least negligence. *Britton v. Koep*, 470 N.W.2d 518, 520 (Minn.1991).

■ We first consider whether appellant is a limited-purpose public figure. If so, he may only recover by showing that Peterson's "statement was made with 'actual malice,'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). The public or private status of the plaintiff in a defamation action is a question of law, which we consider de novo. *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966).

■ Generally, public figures are those whose exceptional access to the media affords them " 'a more realistic opportunity to counteract false statements than private individuals normally enjoy.' " *Scheibel v. Pavlak*, 282 N.W.2d 843, 856 (Minn.1979) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974)); *see also Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 486 (Minn.1985) (effective media access is a "distinguishing feature" of public figures).

■ In certain circumstances, the United States Constitution treats private citizens who are not otherwise public figures as public figures for the purpose of comment upon certain issues; these individuals are known as limited-purpose public figures. *See Wolston v. Reader's Digest Assoc.*, 443 U.S. 157, 165–69, 99 S.Ct. 2701, 2706–08, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire*, 443 U.S. 111, 134, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). A limited-purpose public figure is defined as

an individual [who] voluntarily injects himself or is drawn into a particular public controversy and therefore be-

comes a public figure for a limited range of issues.

*Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013 (internal quotations omitted) (alteration in original).

■ To determine whether Chafoulias was a limited-purpose public figure in this matter, we must consider whether: (1) a public controversy existed; (2) appellant assumed a purposeful or prominent role in that controversy; and (3) the allegedly defamatory statement was related to the public controversy. *Hunter v. Hartman,* 545 N.W.2d 699, 704 (Minn.App.1996) (citing and adopting test established in *Waldbaum v. Fairchild Publ'ns, Inc.* 627 F.2d 1287, 1296–98, (D.C.Cir.1980)), *review denied* (Minn. June 19, 1996).

### A. Public Controversy

■ Appellant challenges the district court's conclusion that there was a public controversy involving the sexual harassment of Rochester women by Arab males, arguing that (1) there was no proper controversy, only media attention and a trial; and (2) if there was a controversy, it was generated by respondents, who cannot by their own conduct create a legal defense by foisting public-figure status on appellant. Respondents argue that the alleged harassment generated significant public interest and controversy prior to and independent of the lawsuit and the broadcast. The record supports respondents' argument.

■ "A public controversy is not simply a matter of interest to the public; it must be a real dispute * * *." *Waldbaum,* 627 F.2d at 1296; *see also Time, Inc. v. Firestone,* 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976) (essentially private concerns or disagreements do not become public controversies simply because they attract attention).

■ To determine whether a public controversy existed, this court

must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy.

*Waldbaum,* 627 F.2d at 1297 (citation and footnotes omitted).

Appellant first argues that there was no "dispute" here because "[a]ll responsible citizens * * * oppose sexual harassment." But the record shows that the public debate in Rochester in the wake of the allegations was not between those opposed to and those in favor of sexual harassment. The debate was about whether the allegations were being sufficiently investigated by the women's employers or Rochester law-enforcement officials.

The record shows that before the harassment lawsuit was filed, Rochester-area news sources were investigating several contentious and divisive topics related to the allegations. Published and televised news reports uncovered facts and theories to help the public determine the veracity of the allegations and of charges that Rochester police, bowing to pressure from the local business community, were not sufficiently investigating the allegations. Media reports paid special attention to the fact that the alleged harassers, wealthy Arabs receiving medical treatment at the Mayo Clinic, made vital contributions to

the local economy. The potential impact of alienating such an important client group gave the controversy significance for people beyond those immediately involved in the dispute, as did the potential impact on norms and attitudes about sexual harassment.

Appellant argues that Peterson cannot invoke the public-figure defense when she herself created the public controversy that turned him into a public figure. *See Jadwin,* 367 N.W.2d at 485 ("[T]hose charged with defamation cannot by their own conduct create their defense by giving the claimant public figure status.").

The record does not indicate that Peterson created this controversy or conferred public-figure status on appellant by making the statement. Numerous newspaper articles and television programs, published before the suit was filed, documented the allegations of harassment and hotel-management nonfeasance, and indicate that the sexual-harassment dispute existed before Peterson filed the suit or even learned of the allegations. Appellant, with the assistance of a public-relations firm hired specifically to protect his reputation in the face of the allegations, took affirmative action to influence the nature of media coverage.

Appellant also argues that the public controversy about the alleged harassment was limited to the disputes underlying the federal lawsuit filed by Peterson in June 1996. Appellant correctly cites to *LeDoux v. N.W. Publ'g, Inc.,* 521 N.W.2d 59, 66 (Minn.App.1994), *review denied* (Minn. Nov. 16, 1994), for the proposition that litigation cannot be the controversy that confers public-figure status. But *LeDoux* is inapposite here because the public controversy of the sexual harassment of Rochester women by Arab visitors was far broader than the dispute underlying the federal lawsuit. The broader controversy could reasonably be expected to affect individuals not directly involved in the lawsuit. Appellant himself acknowledged as much in a letter written to Twin Cities television station KSTP on April 26, 1996, in which he wrote that "our hotel and other area businesses have been impacted by the [harassment allegations]." Appellant is not someone who became a public figure "simply by virtue of [his] being drawn into a courtroom." *Time, Inc.,* 424 U.S. at 457, 96 S.Ct. at 967.

■ The record is undisputed that there was significant public debate about the sexual harassment of women by Arab men before Peterson filed the lawsuit, and that the alleged acts of harassment were completed before Peterson was aware of them. There is little doubt that Peterson's actions, which included distributing "Wanted" posters in the Rochester area offering cash rewards for the "apprehension" of various Arab men identified by name and photograph, were appalling and a discredit to the legal profession. But Peterson's involvement in publicizing the controversy was an effect of the controversy, and not its cause, as appellant contends. We note that "[c]reating a public issue * * * is not the same as revealing one." *Trotter v. Jack Anderson Enters., Inc.,* 818 F.2d 431, 434 (5th Cir.1987).

**B. Appellant's Role in the Controversy**

■ Appellant argues that there was a genuine issue of material fact as to whether he assumed a purposeful or prominent role in the controversy, asserting that he merely reacted to Peterson's allegations in order to defend himself. We disagree.

■ To determine whether appellant assumed a purposeful or prominent role in the controversy, we must examine the nature and extent of his participation in the

controversy giving rise to the alleged defamation. *See Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013. To do so, we consider: (1) whether his involvement was voluntary; (2) whether and to what extent he had access to channels of effective communication to counter false statements; and (3) his prominence in the controversy. *Id.* at 344–45, 94 S.Ct. at 3009–10. Our analysis may examine "[Chafoulias's] past conduct, the extent of the press coverage, and the public reaction to his conduct and statements." *Waldbaum,* 627 F.2d at 1297 (citation omitted).

██ Appellant contends, with some merit, that he should not have to choose between remaining silent in the face of libelous statements and sacrificing his private-figure status. But voluntary discussion of events with the press does not automatically indicate that a defamation plaintiff has thrust himself to the forefront of a public controversy. *See Time, Inc.,* 424 U.S. at 454 n. 3, 96 S.Ct. at 965 n. 3 (defamation claimant does not become a public figure by convening press conferences in an attempt to satisfy inquiring reporters).

██ Rather, an individual's contacting the media contributes to his public-figure status when he has done so in an attempt to influence the resolution or merits of a controversy, *see id.,* has "draw[n] attention to himself in order to invite public comment," *Wolston,* 443 U.S. at 168, 99 S.Ct. at 2707, or has "invited that degree of public attention and comment * * * essential to meet the public figure level." *Hutchinson,* 443 U.S. at 135, 99 S.Ct. at 2688.

Appellant repeatedly interacted with the press in an attempt to influence the resolution of the controversy and control the public perception of the allegations against himself and the Radisson. In November 1995, appellant's son Andrew, a top executive at appellant's management company, hired a public-relations firm to develop a media-relations strategy for the Radisson to protect the hotel's, and appellant's family's, reputation in the wake of the harassment allegations.

In correspondence with KSTP, appellant outlined new Radisson policies concerning appropriate guest conduct. Appellant suggested to David Page, an ABC News producer, that instead of investigating the harassment allegations, Page should investigate Peterson's unethical legal tactics. After the PrimeTime Live broadcast and the settlement of the federal harassment suit, Rochester television station KTTC conducted a two-part interview with appellant in which appellant defended his position with respect to the harassment suit and discussed upcoming development projects. This interview illustrates both appellant's access to the media and his willingness to use that access to influence the ultimate outcome of the public controversy surrounding the harassment allegations, beyond the resolution of the lawsuit.

██ Appellant argues that his repeated refusal to be interviewed by ABC is evidence that his participation in the controversy was involuntary and did not make him a public figure.

> Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has "invited comment" relating to the issue at hand.

*Waldbaum,* 627 F.2d at 1298. Appellant's selective refusal to consent to interviews, after purposefully communicating with media outlets on the advice of his lawyers and public-relations specialists, is not credible evidence of his unwillingness to participate publicly in the controversy.

■ We are sympathetic to the fact that appellant did not want the attention he received as a result of the allegations that he was condoning sexual abuse and harassment in his hotel. And there is little doubt that Peterson's actions contributed to the media circus that ensued. But appellant could not obscure his prominent role in the controversy by periodically refusing to submit to interviews. Indeed, his efforts to control media interest in the allegations by alternately seeking out and then rejecting media attention may have thrust him further into the controversy, even if his intent was the opposite.

> [T]he status of public figure vel non does not depend upon the desires of an individual. The purpose served by limited protection to the publisher of comment upon a public figure would often be frustrated if the subject of the publication could choose whether or not he would be a public figure. * * * It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.

*Rosanova v. Playboy Enters., Inc.* 580 F.2d 859, 861 (5th Cir.1978).

> [T]he plaintiff's action may itself invite comment and attention, and even though he does not directly try or even want to attract the public's attention, he is deemed to have assumed the risk of such attention.

*Marcone v. Penthouse Int'l Magazine For Men,* 754 F.2d 1072, 1083 (3rd Cir.1985) (citations omitted). A limited-purpose public figure is one who either "injects himself or *is drawn into* a particular public controversy." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013 (emphasis added).

On independent review of the record, we conclude that appellant actively and voluntarily injected himself into the dispute over sexual harassment in an effort to influence the outcome of the controversy.

We also conclude that appellant had "access to the channels of effective communication and hence ha[d] a * * * realistic opportunity to counteract false statements." *Id.* at 344, 94 S.Ct. at 3009. Appellant is well known in Rochester for several major downtown building projects, several of which have been funded or subsidized with public money. The record contains hundreds of newspaper articles discussing both appellant's business ventures and his private life.

It is true that media attention alone could not make appellant a limited-purpose public figure. *See Jadwin,* 367 N.W.2d at 485–86 (business activities attracting media attention did not transform a businessperson into a limited-purpose public figure). Nor does public investment in a development project make the developer a public figure. *See id.* at 486. Rather, we conclude that the general interest in appellant gave him "the regular and continuing access to the media that is one of the accouterments of having become a public figure." *Hutchinson,* 443 U.S. at 136, 99 S.Ct. at 2688; *see also Jadwin,* 367 N.W.2d at 486 ("distinguishing feature" of public figures is the ability "to rebut the alleged libelous publication").

Appellant had adequate access to channels of effective communication because the press presented him with many opportunities to be interviewed and he was in fact interviewed on several occasions. He "aggressively promoted h[is] version of the case" both before and after the court proceedings. *Street v. NBC,* 645 F.2d 1227, 1235 (6th Cir.1981). He employed a public-relations firm and repeatedly contacted the media as a means of communicating his position to the public and influencing the outcome of the sexual-harassment controversy. His willingness and ability to contribute to the debate supports the conclusion that his involvement in the contro-

versy was voluntary and that he was effectively able to broadcast his view of the federal lawsuit and the broader controversy to the public. *See id.* at 1234–35.

The evidence here shows that appellant's involvement in the harassment controversy went far beyond the low-key participation one might expect of someone attempting to avoid the public eye. Appellant contends that his contact with the media was necessary to vigorously defend himself, but it appears on the record before us that his conduct rose beyond this level. Appellant affirmatively and voluntarily engaged in a course of action with respect to the debate that was bound to invite public attention and comment. The district court appropriately found that appellant took a prominent role in the controversy.

## C. Relation Between the Statements and the Controversy

Peterson's statement directly relates to the allegation, at the heart of the public controversy, that appellant failed to act to prevent Rochester women from being sexually harassed and assaulted by male Arab visitors.

We conclude that the district court, having appropriately examined the "nature and extent of [Chafoulias's] participation in the particular controversy giving rise to the defamation," *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013, did not err by concluding as a matter of law that appellant was a limited-purpose public figure.

## II.

Chafoulias challenges the district court's conclusion that ABC did not act with actual malice in broadcasting, and Peterson did not act with actual malice in making, the allegedly defamatory statement. Whether a statement was made with actual malice is a question of law, which we review de novo. *Britton,* 470 N.W.2d at 524. On appeal from summary judgment in a defamation case brought by a public figure, our task is to determine whether "the record could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence." *Foley v. WCCO Television, Inc.* 449 N.W.2d 497, 503 (Minn.App.1989), *review denied* (Minn. Feb. 9, 1990).

To prevail in this defamation action, Chafoulias must prove that Peterson's statement was made and broadcast with actual malice, that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.,* 376 U.S. at 280, 84 S.Ct. at 726. "Reckless [disregard] is not measured by whether a reasonably prudent person would have published or would have investigated before publishing." *Connelly,* 448 N.W.2d at 903 (citing *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)). Instead, the defamatory statement must have been published with a subjective awareness of its probable falsity, as demonstrated by "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325.

The Supreme Court, by way of example, has observed that a statement may have been made with actual malice if it

> is fabricated by the defendant, is the product of his imagination, * * * is based wholly on an unverified anonymous telephone call [or if] the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.

*Id.* at 732, 88 S.Ct. at 1326.

"The burden of proving actual malice is upon the one alleging defamatory

statements and it must be proved with convincing clarity." *Hirman,* 257 N.W.2d at 566 (citation omitted). Chafoulias offered circumstantial evidence to show that Peterson and ABC in fact entertained serious doubts as to the truth of their publication. *See Connelly,* 448 N.W.2d at 904 (noting that use of circumstantial evidence is authorized to prove actual malice).

The actual-malice standard is intended to protect free speech by severely limiting the ability of public figures to recover damages for defamation. *See Hirman,* 257 N.W.2d at 566. Consequently, summary judgment on the issue of actual malice has historically been the preferred disposition in defamation cases brought by public figures. *See Foley,* 449 N.W.2d at 504.

### A. Peterson's Actual Malice

Appellant sets out three factors in support of his argument that Peterson acted with actual malice: (1) Peterson's ill-will toward appellant; (2) Peterson's reliance on a known unreliable source for her statement that appellant failed to stop the sexual abuse of his employees; and (3) the inherent improbability of Peterson's statement.

 Appellant first argues that Peterson's ill-will toward him, as evidenced by her videotaped allegations, demonstrates that the truth is unimportant to her. But while evidence of the speaker's motive may bear some relation to a determination of actual malice, "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989) (citations and footnote omitted).

It is not enough for a public official to show that the defendant has acted from personal ill-will but rather he must prove that the publication was made with a high degree of awareness that it was probably false.

*Hirman,* 257 N.W.2d at 566 (citations omitted). Without other evidence, Peterson's ill-will is not clear and convincing evidence of actual malice. *See id.* at 567 (concluding that "longstanding animosity" between the parties was insufficient to prove actual malice).

 Appellant next argues that Peterson acted with a reckless disregard for the truth of her statement by relying on a known unreliable source, D.W., for the information contained in the statement. "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.,* 390 U.S. at 732, 88 S.Ct. at 1326 (citations and footnote omitted). Appellant contends that D.W. is unreliable because she changed her account of whether she notified him of sexual abuse alleged to have occurred in the Radisson employee elevator in August 1994. Appellant argues that D.W. initially claimed she had told only her supervisor and manager, and never claimed she had informed appellant of this event until her videotaped interview with ABC.

We do not agree. The record shows that D.W. described the assault two times, in two separate conversations: one with her supervisor and manager, and another, at a later time, with appellant. Nowhere in the record does D.W. claim that she never told appellant about the assault. There is no discrepancy between D.W.'s statements, and appellant has therefore not demonstrated that Peterson had obvious reasons to doubt D.W.'s veracity.

 Finally, appellant argues that Peterson acted with actual malice because, in light of appellant's excellent reputation

in Rochester, Peterson's "allegations are so inherently improbable that only a reckless [wo]man would have put them in circulation." *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. We are troubled by appellant's suggestion that an individual's reputation should function as a prior restraint on another individual's freedom to allege wrongdoing. We also note that reputation alone, however excellent it may be, cannot render defamatory allegations inherently improbable or conclusively prove that an individual spoke with actual malice. It does not logically follow that Peterson's statement was reckless because it concerned an individual with an excellent reputation.

Moreover, evidence in the record supporting the truth of Peterson's statement precludes the conclusion that the statement was inherently improbable. There is evidence that appellant knew about sexual harassment and abuse in his hotel as early as 1993. Appellant testified that in 1993 he learned of the sexual assault of employee C.H. by an Arab guest. Former Radisson manager Jerry Smith testified that he and appellant discussed the July 1993 sexual assault of S.M. by an Arab guest immediately after the assault took place. A report prepared for appellant by his attorneys in July 1995 states that hotel management repeatedly failed to investigate employee allegations of harassment by Arab guests.

Peterson herself conducted an extensive investigation of the allegations before filing the federal suit and believed in the substantial truth of her statement. In a settlement letter sent to appellant's attorneys, she described more than 60 specific incidents of harassment and abuse that had been related to her during interviews with former Radisson employees. Many of these allegations were supported by police reports and charges of discrimination

filed with the Minnesota Department of Human Rights.

Peterson took a sworn statement from a former Rochester Radisson security guard who told Peterson that after one assault by an Arab guest in November 1993, hotel management initially refused to report the incident to the police. When the police were called, they interviewed the alleged assailant, after which appellant had the guard apologize to the Arab guest for any inconvenience the complaint had caused him.

A former Rochester Radisson personnel manager stated in an affidavit that after one alleged assault, hotel manager Jerry Smith tried to prevent the Rochester Police from filing criminal sexual conduct charges against the guest in order to avoid publicity. Former hotel managers told Peterson that appellant was regularly briefed on complaints about the Arab guests and participated in developing management responses.

Peterson interviewed accusers and witnesses, confirmed stories, and attempted to verify allegations. The record supports the conclusion that Peterson believed the truth of the allegations.

 The district court did not err by concluding that appellant failed to present clear and convincing evidence of Peterson's actual malice. The court properly granted Peterson summary judgment on the actual malice issue and properly dismissed the defamation claim against Peterson.

**B. ABC's Actual Malice**

 Appellant argues that ABC's overall failure to sufficiently investigate the controversy before broadcasting Peterson's statement indicates actual malice. Appellant contends that ABC relied on unreliable witnesses, maliciously adopted Peterson's version of events, and disre-

garded evidence that contradicted Peterson's story. Because the record shows that ABC conducted a lengthy investigation and came to believe that Peterson's statement was corroborated and at least arguably true, we do not agree.

■ Generally, the mere failure to investigate does not establish knowledge of falsity or serious doubt about the truth of a story, *Connelly*, 448 N.W.2d at 904, and such failure is insufficient to establish recklessness for purposes of a libel suit. *Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir.1987); *see also Harte–Hanks Communications, Inc.*, 491 U.S. at 688, 109 S.Ct. at 2696 (stating that "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard").

Appellant observes that D.W. admitted, in video taken by ABC but not broadcast, that she never explicitly told Chafoulias about being digitally penetrated by an Arab hotel guest. Appellant argues that ABC therefore acted with actual malice by broadcasting Peterson's statement alleging Chafoulias's knowledge of the penetration.

David Page, the ABC producer who worked on "The VIP Floor," submitted an affidavit expressing his belief that "anyone hearing [D.W.] describe her assailant violently thrusting his hand down her nylons would have to have understood where that hand ended up." ABC investigated the allegation and concluded that appellant's knowledge that D.W. had been digitally penetrated was at least arguably true. Even if it were untrue that appellant had knowledge of the penetration, ABC did not clearly broadcast Peterson's statement with knowledge that it was false or with reckless disregard of whether it was false or not.[1]

Next, appellant challenges the sufficiency of ABC's investigation, arguing that "The VIP Floor" was a "wholesale adoption" of Peterson's version of events. Appellant cites to *Stokes v. CBS Inc.*, 25 F. Supp 2d 992, 1004 (D.Minn.1998) for the proposition that a highly slanted perspective and a preconceived story line may demonstrate a reckless disregard of the truth and support a finding of actual malice. Appellant's reliance on *Stokes* is misplaced. In *Stokes*, the court concluded that media defendants had acted with actual malice by taking a "source's emotional assertions at face value, without checking their factual bases." *Id.* Here, the record shows that ABC conducted a careful independent review of the sexual-harassment

---

1. Because we affirm the grant of summary judgment in ABC's favor, we do not address ABC's claim, raised by notice of review, that "The VIP Floor" was privileged as a fair and accurate report or a fair abridgement of the federal harassment lawsuits. *See Moreno*, 610 N.W.2d at 332 (the media generally have a qualified privilege when making a fair and accurate report of public records). We note, however, that "The VIP Floor" would not likely enjoy the privilege, because it is "edited in such a manner as to misrepresent the proceeding and become misleading." *Id.* at 332 (citing Restatement (Second) of Torts § 611, cmt. f). "The VIP Floor" is a montage of statements by parties to the harassment lawsuit edited to create a factually accurate but rhetorically and breathlessly inflammatory narrative. The report gives the erroneous impression that appellant knew that all five of his ex-employees were raped, when in fact appellant knew of only one alleged rape. More egregiously, the report never mentions D.W.'s acknowledgement, videotaped but not broadcast by ABC, that an allegation she made in the federal suit was untrue. *See* Restatement (Second) of Torts § 611, cmt. f. (privilege is lost if the report fails to mention the discovery of discreditable testimony in a judicial proceeding). Nothing about the segment gives the impression of fair, objective, or balanced reporting. But bad journalism is not the same as reckless disregard of the truth.

allegations, and did not simply adopt Peterson's theory of the controversy.

■ Appellant is really challenging the style and presentation of ABC's broadcast rather than its factual content. It is true that the broadcast's selective, and arguably unfair, use of facts and sensational style made appellant look bad. But presentation of a slanted news story is not actual malice. *See Speer*, 828 F.2d at 478; *Westmoreland v. CBS Inc.*, 596 F.Supp. 1170, 1173 (S.D.N.Y.1984) (choices made by news organizations in preparing and presenting reports, such as "the selection of interviewees, the framing of questions and the handling of witnesses" are insufficient basis for establishing actual malice even when "designed to confirm a hostile premise rather than to find the truth").

Appellant next argues that ABC recklessly failed to investigate the veracity of its main source, Peterson. *See St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326 ("recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of [the] reports"). Appellant argues that Peterson's credibility is "lacking across the board," given her dubious legal strategy of media manipulation, and that ABC's decision to trust her constitutes actual malice. Appellant cites to newspaper articles relating the breakup of Peterson's law firm and Peterson's professional misconduct sanctions as evidence that Peterson's past is cluttered with "red flags" that should have alerted ABC to Peterson's unreliability.

■ But mere failure to investigate is not evidence of actual malice, and "[m]ere errors in judgment are not sufficient to constitute actual malice." *Valento v. Ulrich*, 402 N.W.2d 809, 812 (Minn.App.1987) (quotation omitted). Nor are details about Peterson's professional travails or generalizations about her litigation strategy germane to a determination of her credibility.

Even assuming that ABC had some reason to doubt Peterson's veracity, ABC conducted an investigation to corroborate her charges. By the time of the broadcast, ABC had an independent basis to believe that Peterson's statements about appellant were true. That ABC came to the same conclusion as Peterson about appellant's knowledge of the harassment and abuse does not prove that ABC recklessly adopted Peterson's version of events; it demonstrates that ABC investigated the charges and satisfied itself that the allegations were substantially based in fact. *See Tavoulareas v. Piro*, 817 F.2d 762, 795–96 (D.C.Cir.1987) ("An adversarial stance is certainly not indicative of actual malice under the circumstances where, as here, the reporter conducted a detailed investigation and wrote a story that is substantially true." (citation omitted)).

Appellant argues that statements made by reporter Brian Ross during "The VIP Floor" stating that appellant used his "influence" to effect a police "cover-up" of the sexual-harassment allegations are provocative, inflammatory, and evidence of ABC's actual malice. The words "influence" and "cover-up" are not alleged as defamatory in appellant's original complaint. On January 13, 2000, the district court denied appellant's motion to amend his complaint to include a defamation claim for defamation based on the "cover-up" and "influence" statements. "Influence" and "cover-up" cannot therefore be used to prove ABC's actual malice. *See Benson v. N.W. Airlines, Inc.*, 561 N.W.2d 530, 538 (Minn. App.1997) (allegedly defamatory statements not contained in plaintiff's complaint beyond scope of plaintiff's claim), *review denied* (Minn. June 11, 1997).

Finally, appellant argues that the statement's inherent improbability is evidence that ABC acted with actual malice. We

reject this argument as to ABC for the same reason we rejected it as to Peterson.

ABC's broadcast of Peterson's statement does not constitute "evidence of an intent to avoid the truth." *Harte–Hanks Communications, Inc.*, 491 U.S. at 693, 109 S.Ct. at 2698. The district court properly granted ABC summary judgment on the issue of actual malice.

## DECISION

The district court correctly determined that appellant is a limited purpose public figure and that he failed to present clear and convincing evidence that respondents acted with actual malice. The district court therefore did not err in granting summary judgment in favor of respondents. Because we affirm the decision in respondents' favor, we do not reach the claims raised by notice of review.

**Affirmed.**